636 So.2d 749 (1994)
STATE of Florida DEPARTMENT OF TRANSPORTATION, Appellant,
v.
Joseph J. RUBANO, et al., Appellees.
No. 92-2695.
District Court of Appeal of Florida, Fourth District.
February 2, 1994.
Thornton J. Williams, General Counsel, Gregory G. Costas, Asst. General Counsel, Tallahassee, for appellant.
Allan M. Rubin of Shea & Gould, Miami, for appellees.

*750 ON MOTION FOR REHEARING

KLEIN, Judge.
Appellees' motion for rehearing points out that our opinion filed December 8, 1993, contains the wrong date for completion of the I-95 bridges and omits the fact that westbound access was on old SR-84 while it was temporarily being used as a service road during some of the construction. While those facts do not affect the outcome, we deem it appropriate to correct them and therefore substitute this opinion for the opinion filed December 8, 1993. Appellees' motion for rehearing is denied.
This is an inverse condemnation case in which the trial court concluded that there was a temporary taking of access to appellees' property while new roads were being constructed by the State Department of Transportation (DOT). The DOT appeals, arguing that the rerouting of traffic required by the construction is not compensable. We reverse, but certify the issue as one of great public importance.
The five properties are on the north side of SR 84, a major arterial highway in Broward County west of I-95. The construction of I-595 and two new bridges on SR 84 over I-95 began in December, 1987. Prior to this time the properties abutted the westbound lanes of SR 84 and were accessible directly from it. Eastbound traffic on SR 84 had access by making a protected highly visible U-turn near the intersection of Ravenswood Road and SR 84 and returning on westbound SR 84. This U-turn was about 1000 to 1500 feet east of the properties.
When this construction began DOT temporarily relocated SR 84 to the north, destroyed the Ravenswood U-turn, and erected a continuous line of concrete barriers between the east and westbound lanes of relocated SR 84. Eastbound traffic on SR 84, in order to get to these properties, which included a truck dealership and a diesel engine dealership, then had to travel an additional one and one-half miles beyond the former Ravenswood U-turn, to Southwest 15th Avenue, make a more difficult, unprotected U-turn, and return on westbound SR 84, which continued to have access.
In January 1989 the DOT temporarily relocated all travel lanes of SR 84 to the south, in order to construct new bridges over I-95, and temporarily used the old westbound lanes of SR 84 as a service road with access to these properties from January 1989 through May 1990. The I-95 bridges were completed in July, 1990, and a maneuver known as a Texas U-turn, involving the use of the roads linking I-95 and SR 84, became available. This U-turn was farther from the property, and more difficult, than the original Ravenswood U-turn, but it was nearer the property than the Southwest 15th Avenue U-turn.
The property owners filed this inverse condemnation action claiming both a temporary and permanent loss of access for which compensation should be paid.
At trial plaintiffs' experts testified that the rerouting of eastbound SR 84 traffic both before and after completion of the I-95 bridges was a substantial permanent impairment of access. The DOT's experts admitted that if the conditions before completion of the I-95 bridges (Texas U-turn) had been permanent, there would have been an "unreasonable" and "significant impairment in quality of access." The DOT stipulated during trial to construct a protected U-turn on SR 84 west of Ravenswood to be completed by Labor Day, 1992.
The trial court found that the properties suffered a temporary "substantial impairment of access" which is compensable. He based these findings on the distance which eastbound traffic had to travel; the lack of visibility of access to the properties by eastbound traffic; the fact that these were primarily large trucks which needed access; and the logistics, which included inadequate and unsafe turning radii, of the U-turns. One of the businesses had to relocate its parts business to a leased location on SR 84 where access was unimpaired, incurring renovation and additional employee expense. The court found that when the I-95 connections to SR 84 were restored by July of 1990, providing the nearer Texas U-turn, suitable access was still not restored, and that it would not be restored until the DOT completed *751 the protected U-turn near Ravenswood, which it stipulated to provide during trial.
The DOT first argues that the property owners are not entitled to compensation for loss of access during construction. The DOT relies on language in Anhoco Corporation v. Dade County, 144 So.2d 793, 799 (Fla. 1962), which says that property owners should not be compensated for loss of access:
[o]ccasioned merely by the customary limitations on the flow of traffic over a highway which is being constructed under so-called "traffic conditions." Every business abutting an established highway which is being reconstructed suffers the same type of loss. To this extent any damage suffered is damnum absque injuria.
In Anhoco the owners of two outdoor movie theaters were deprived of all access to abutting SR 826 during a period of time while the Florida Turnpike Authority was doing construction, after which access to SR 826 was restored. Notwithstanding the above language relied on by the DOT, our supreme court held that there was such a destruction of access in Anhoco as to entitle the property owners to compensation. Anhoco does not, therefore, stand for the proposition that loss of access as a result of construction is not compensable. What Anhoco does stand for, as the above quoted language reflects, is that in order to be compensable the loss of access has to be different than that suffered by all of the other abutting businesses. Since the trial court found that the property owners in this case were affected differently from all other abutting property owners, Anhoco does not preclude compensability.
DOT does not argue that a loss of access must be permanent in order to be compensable, presumably since the loss of access in Anhoco was temporary, and subsequently recognized as such in Palm Beach County v. Tessler, 538 So.2d 846, 848-849 (Fla. 1989).
The DOT next argues that Anhoco and Tessler require that all access to the abutting road must be cut off in order for it to be compensable. Although those cases both involved loss of all access to the abutting road, neither of those opinions appear to make it a prerequisite for compensability.
In Tessler the property owner operated a beauty salon on Palmetto Park Road in Boca Raton, but permanently lost all access to that road resulting in customers having to access the property by winding 600 yards through a residential neighborhood. Our supreme court held that the property owner was entitled to compensation for a loss of access, stating:
There is a right to be compensated through inverse condemnation when governmental action causes a substantial loss of access to one's property even though there is no physical appropriation of the property itself. It is not necessary that there be a complete loss of access to the property.
Because of this language in Tessler we reject the DOT's argument that all access to the abutting road must be eliminated for there to be a compensable taking. See also, DOT v. Lakewood Travel Park, 580 So.2d 230 (Fla. 4th DCA), review denied, 592 So.2d 680 (Fla. 1991).
Although the court concluded in Tessler that there was a compensable loss of access, it went on to state:
However, the fact that a portion or even all of one's access to an abutting road is destroyed does not constitute a taking, unless, when considered in light of the remaining access to the property, it can be said that the property owner's right of access was substantially diminished. The loss of the most convenient access is not compensable where other suitable access continues to exist. A taking has not occurred when governmental action causes the flow of traffic on an abutting road to be diminished.
The question we must determine is whether this is the "substantial loss of access" which is compensable under Tessler or merely the "loss of the most convenient access" or diminished "flow of traffic" which is not compensable *752 under Tessler. Once the factual issues are resolved the question of whether the landowner has incurred a substantial loss of access is a question of law. Tessler at 850.
In addition to Anhoco and Tessler, there is one other significant supreme court decision involving loss of access, Division of Administration v. Capital Plaza, 397 So.2d 682, 683 (Fla. 1981). In that case the DOT widened the Thomasville road in Tallahassee, formerly two lanes with no median, into six lanes divided by a raised four-foot-wide median. The issue was whether the construction of this median resulted in a compensable loss of access to a service station since northbound drivers could no longer make a left turn directly into the service station. The supreme court held that the construction of a median would not constitute a compensable loss of access, because "a land owner has no property right in the continuation or maintenance of traffic flow past his property." In Tessler the supreme court discussed and distinguished Capital Plaza, and left no doubt that it is still good law.
Applying the principles set forth in Tessler and Capital Plaza to the facts in the present case is difficult because the facts in the present case differ significantly from the facts in Tessler and Capital Plaza. In Tessler the property owner owned a beauty salon on a busy commercial road, and the widening of the road and construction of a bridge permanently deprived the owner of all access to that or any other commercial road. The beauty salon was not even visible from the commercial thoroughfare. The customers were only able to reach the property by traveling 600 yards on a winding route in a residential neighborhood.
In the present case the access to the abutting road was not eliminated by the widening of it. Eastbound traffic was temporarily rerouted so that it had to go an additional one and one-half miles before making a U-turn to return in the westbound lane from which there always was access. It therefore appears to us that the loss of access in Tessler was far more egregious, forgetting for the moment that it was permanent there and temporary here.
Capital Plaza is strikingly similar to this case in that the concrete barriers installed in this case only affected the accessibility of traffic going in one direction, just as the median did in Capital Plaza, in which the supreme court pointed out that the service station still had "free, unimpeded access ... albeit only by southbound traffic." On the other hand, the construction of the median in Capital Plaza had less of an affect on access to the service station, since it was located at an intersection,[1] than the rerouting of traffic did to these property owners.
The final judgment contains detailed findings of fact and a scholarly and well-reasoned analysis of the case law leading up to the conclusion that there was a taking, and it was not without difficulty that we have concluded that the case law requires reversal. Tessler does not persuade us, however, that there was a taking because in Tessler the loss of access to the abutting road was both total and permanent, while in the present case it was neither. While we realize that a loss of access does not have to be permanent in order to be compensable, we believe the duration of the loss is still one fact to be considered. We also find it difficult to distinguish Capital Plaza since the median in Capital Plaza and the concrete barriers erected here were similar in that they affected the access of traffic in one direction only. We therefore conclude that there was no taking of access.
In reversing, we are not unmindful of these property owners' constitutional rights to compensation for the taking of their property, or the ramifications of expanding those rights (as we see it) to allow compensability here. Because of these concerns, and because this question is close, we certify as an *753 issue of great public importance whether this was a compensable taking of access.[2]
Reversed.
DELL, C.J., and STONE, J., concur.
NOTES
[1] The supreme court did not mention in its opinion that the service station was located at an intersection, however the first district did. Capital Plaza, Inc. v. Division of Administration, 381 So.2d 1090 (Fla. 1st DCA 1979).
[2] In State Department of Transportation v. FMS Management Systems, Inc., 599 So.2d 1009 (Fla. 4th DCA 1992), in which this court affirmed without opinion, Judge Anstead, concurring specially, noted that Tessler was difficult to apply and that he would have certified the issue in that case as one of great public importance.