656 So.2d 1264 (1995)
Joseph J. RUBANO, et al., Petitioners,
v.
DEPARTMENT OF TRANSPORTATION, Respondent.
No. 83307.
Supreme Court of Florida.
June 22, 1995.
*1265 Alan E. DeSerio of Brigham, Moore, Gaylord, Schuster & Merlin, Tampa, and Allan M. Rubin of Shutts & Bowen, Miami, for petitioner.
Thornton J. Williams and Gregory G. Costas, Asst. Gen. Counsel, Dept. of Transp., Tallahassee, for respondent.
ANSTEAD, Justice.
We have for review State Department of Transportation v. Rubano, 636 So.2d 749 (Fla. 4th DCA 1994), which certified to us, as a question of great public importance, whether the Florida Department of Transportation (DOT) effectuated a temporary but compensable taking of access of petitioners' property during a highway improvement project. Although the district court merely certified to us whether there was a "compensable taking of access" in this case, 636 So.2d at 752-53, we have formulated a question to narrow the issue before us:
DID THE DEPARTMENT OF TRANSPORTATION ENGAGE IN A COMPENSABLE TEMPORARY TAKING OF ACCESS WHEN IT ELIMINATED PETITIONERS' DIRECT ACCESS TO A STATE ROAD BY PLACING PETITIONERS' PROPERTY ON A SERVICE ROAD, ELIMINATED A PROTECTED U-TURN AND REPLACED IT WITH ANOTHER U-TURN WHICH ADDED ONE AND ONE-HALF MILES OF TRAVEL TO REACH THE PROPERTIES, AND SEVERED THE CONNECTIONS FROM INTERSTATE 95 TO STATE ROAD 84?
We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. For the reasons expressed below, we answer the certified question in the negative.

Procedural Posture
This action involves five separate inverse condemnation actions which were consolidated for trial. The trial court concluded that there was a taking of access to petitioners' properties while roads were being improved and constructed by DOT. The DOT appealed to the Fourth District arguing that the rerouting of traffic required by the construction was not compensable. The Fourth District agreed and reversed.

*1266 Pre-Construction Conditions

The five commercial properties are all located in Broward County west of I-95 and between S.W. 26th Terrace and S.W. 23rd Terrace on the north side of State Road 84 (S.R. 84), a divided highway which runs east and west. The properties abutted the northernmost westbound lane of S.R. 84 with direct access to the roadway. Persons traveling east on S.R. 84 could reach the properties by utilizing a protected U-turn at the intersection of Ravenswood Road and S.R. 84 (Ravenswood U-turn), a short distance from the properties. Persons leaving the properties who desired to return to the eastbound lanes could do so by turning right onto the westbound lanes, and then using one of two U-turns located a short distance from the properties.

DOT's Construction Activities
None of petitioners' land was actually taken by the government. Rather, their claim is predicated on the ground that DOT effectively took away their access to S.R. 84 during construction. Three events occurred which petitioners claim deprived them of access to their properties.
First, DOT relocated all existing travel lanes of S.R. 84 to the north of their former location in order to construct a new southern bridge over I-95 on S.R. 84. In furtherance of this relocation, DOT eliminated the Ravenswood U-turn and erected a continuous line of concrete barriers between the eastbound and westbound lanes of newly relocated S.R. 84. Eastbound vehicles on S.R. 84 were then required to travel an additional mile and one-half to a U-turn at S.W. 15th Avenue to gain access to the properties.
Second, when DOT completed construction of the new southern bridge, all travel lanes of S.R. 84 were relocated to the extreme south of its right-of-way in order to construct a new northern bridge for S.R. 84 over I-95. To maintain access to petitioners' properties, DOT created a service road from the old westbound lanes of S.R. 84 by using concrete barriers which separated the service road from the travel lanes of S.R. 84. Access to S.R. 84 was then available to the properties by a narrow break in the concrete barrier wall. With the exception of the western driveway of Parcel 1, the properties no longer directly abutted S.R. 84, but instead abutted the temporary service road. Subsequently, DOT signalized the service road at S.W. 26th Terrace and removed the barrier wall at the western end of the service road.
Third, at the same time that DOT created the service road, it also physically severed all S.R. 84 connections to I-95. All persons seeking access to the properties by the I-95 exits onto westbound S.R. 84 were relegated to using I-595 which exited onto S.W. 26th Terrace, a route which added between 2.32 and 2.43 miles to the previous route for many persons.

DIMINUTION IN ACCESS AS A TAKING
The Florida Constitution states that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner." Art. X, § 6(a), Fla. Const.; see also Village of Tequesta v. Jupiter Inlet Corp., 371 So.2d 663, 669 (Fla.) (holding that Florida Constitution bars the taking of private property except for public use, and then only after full compensation), cert. denied, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 377 (1979). Further, where a government agency, by its conduct or activities, has effectively taken private property without a formal exercise of the power of eminent domain, a cause of action for inverse condemnation will lie. Schick v. Florida Dep't of Agriculture, 504 So.2d 1318, 1319 (Fla. 1st DCA), review denied, 513 So.2d 1060 (Fla. 1987). Proof that the governmental body has effected a taking of the property is an essential element of an inverse condemnation action. Kendry v. Division of Admin., 366 So.2d 391, 393-94 (Fla. 1978).
A taking may occur in a wide variety of circumstances and may be either temporary or permanent. For example, a taking may occur when governmental action causes a loss of access to one's property even though *1267 there is no physical appropriation of the property itself.[1]
In Palm Beach County v. Tessler, 538 So.2d 846, 849 (Fla. 1989), the property owners had a commercial business on Palmetto Park Road in Boca Raton, but permanently lost access to their property from that road when a retaining wall was built directly in front of the property. As a result, customers had to access the property by winding 600 yards through a residential neighborhood. Id. at 847. We concluded that the property owners could recover damages for their loss of access because they lost more than their most convenient means of access. Id. at 850. Quoting from the district court, we stated:
They have shown that the retaining wall will require their customers to take a tedious and circuitous route to reach their business premises which is patently unsuitable and sharply reduces the quality of access to their property. The wall will also block visibility of the commercial storefront from Palmetto Park Road.
Id. While allowing a recovery on these narrow facts, we cautioned:
However, the fact that a portion or even all of one's access to an abutting road is destroyed does not constitute a taking unless, when considered in light of the remaining access to the property, it can be said that the property owner's right of access was substantially diminished. The loss of the most convenient access is not compensable where other suitable access continues to exist. A taking has not occurred when the governmental action causes the flow of traffic on an abutting road to be diminished.
Id. at 849. While petitioners claim that the impairment of access here qualifies as a taking under Tessler, DOT asserts that there was no Tessler-type taking at any point in this case because petitioners' pre-existing right of ingress and egress to and from the abutting public road was never lost during the construction process.

THE SEVERANCE OF I-95 CONNECTIONS TO S.R. 84
Initially, the petitioners candidly concede, and we now find, that DOT's severance of the I-95 connections to S.R. 84 did not sufficiently diminish the petitioners' easements of access so as to constitute a taking. Rather, as we have recently concluded in a similar case, the severance effectuated a diversion of traffic which Florida courts have consistently held not to be compensable. Department of Transp. v. Gefen, 636 So.2d 1345, 1346 (Fla. 1994).
In Gefen, this Court was also confronted with a factual scenario involving a loss of access to I-95. The district court had approved a finding of a taking through loss of access based on Tessler. We reversed, and described the facts as follows:
L.I. Gefen brought an inverse condemnation suit against the Department of Transportation (DOT) alleging that closure of the Interstate 95 (I-95) entrance and exit ramps at McCoy Creek Boulevard destroyed her property's access to I-95, thereby rendering the property valueless and resulting in a taking without compensation. Gefen presented evidence that the property was prime commercial real estate and the closure of the I-95 ramps destroyed it as a profitable business site. The trial judge held that the closure of the ramps constituted a taking without compensation and entered a final judgment requiring DOT to institute an eminent domain proceeding so that damages could be determined. The district court affirmed *1268 on the authority of Palm Beach County v. Tessler, 538 So.2d 846 (Fla. 1989).
Id. Our analysis in Gefen is dispositive of the issue here:
Here, the question is simply whether landowners who enjoy convenient access to and from limited access state highways such as I-95 have a compensable vested right to that access. This Court has ruled that they do not. No person has a vested right in the maintenance of a public highway in any particular place because the state owes no person a duty to send traffic past his door. Jahoda v. State Road Dep't, 106 So.2d 870, 872 (Fla. 2d DCA 1958), disapproved on other grounds, Department of Transp. v. Stubbs, 285 So.2d 1 (Fla. 1973). Access, as a property interest, does not include a right to traffic flow even though commercial property might very well suffer adverse economic effects as a result of reduced traffic. Stubbs, 285 So.2d at 4. The commercial impact of traffic changes was more recently addressed in Department of Transportation v. Capital Plaza, 397 So.2d 682 (Fla. 1981), in which a median, installed as part of a road widening project, channeled traffic away from and limited turns into a service station. The court ruled that there was no deprivation of access but rather a redirection of traffic, for which no recovery was available. Id. at 683.
Id. For the same reasons expressed in Gefen, we find that no compensable taking occurred when DOT severed the I-95 connections to S.R. 84 and, hence, to petitioners' properties.

ELIMINATION OF THE RAVENSWOOD U-TURN
Similarly, we agree with the district court that DOT's elimination of the Ravenswood U-turn did not sufficiently impair the petitioners' access to S.R. 84 to constitute a compensable taking.[2] In resolving this issue, the district court correctly relied on Division of Administration v. Capital Plaza, Inc., 397 So.2d 682 (Fla. 1981). Accord Merit Oil, Inc. v. State, 123 N.H. 280, 461 A.2d 96 (1983).
In Capital Plaza, DOT acquired, through condemnation, a strip of land owned by Capital Plaza, to use in widening a two-lane road. After reconstruction, the road had six lanes and was divided by a raised four-foot-wide median. Due to the median, northbound drivers could no longer turn across traffic and directly into Capital's service station. Capital Plaza, 397 So.2d at 683. At issue was whether the construction of the median resulted in a compensable loss of access to the service station. We held that the construction of the median did not constitute a compensable loss of access, because "a land owner has no property right in the continuation or maintenance of traffic flow past his property." Id. (citation omitted).
In the instant case, the district court stated:

Capital Plaza is strikingly similar to this case in that the concrete barriers installed in this case only affected the accessibility of traffic going in one direction, just as the median did in Capital Plaza, in which the supreme court pointed out that the service station still had "free, unimpeded access... albeit only by southbound traffic." On the other hand, the construction of the median in Capital Plaza had less of an effect on access to the service station, since it was located at an intersection than the rerouting of traffic did to these property owners.
... We also find it difficult to distinguish Capital Plaza since the median in Capital Plaza and the concrete barriers erected here were similar in that they affected the access of traffic in one direction only. We therefore conclude that there was no taking of access.
Rubano, 636 So.2d at 752 (footnote omitted). In short, the district court held that a taking does not occur when the government merely *1269 limits direct access to one's property from one side of a two-way roadway adjacent to the property. We agree and conclude that, because our holding in Tessler did not invalidate or otherwise disturb the holding and reasoning of Capital Plaza, the district court was correct in applying the reasoning of Capital Plaza to this situation.

UTILIZATION OF THE SERVICE ROAD
As with the previous two DOT activities, we find that DOT's temporary conversion of the north side of S.R. 84 to a service road adjacent to petitioners' properties with continuing, although limited, access to S.R. 84 did not constitute a taking under Tessler. In Tessler, respondents' property was denied direct access to a primary commercial thoroughfare  Palmetto Park Road. In this case, petitioners were never denied access to the main road, S.R. 84, and did not lose more than their most convenient means of access for a temporary, albeit extended, period.[3] In fact, it appears that DOT purposefully constructed the temporary service road to provide the properties with continuing access to S.R. 84.
We also find petitioners' reliance on Anhoco Corp. v. Dade County, 144 So.2d 793 (Fla. 1962), misplaced. In Anhoco, the petitioners "owned the basic fee in S.R. 826, with an easement of ingress and egress to and from its theaters which abutted the land service road." Id. at 795. They also owned the land on the north side of State Road 826, which contained two large outdoor theaters, the Western Theater and the Eastern Theater. In August 1957, the Road Department, pursuant to statute and in carrying out its plan to convert S.R. 826 into a limited access highway, dug a ditch across the access road between the Eastern Theater and S.R. 826. As a consequence, access to S.R. 826 was completely eliminated and the Eastern Theater remained closed until October 1958. During this same month, the Road Department dug another ditch and access to the Western Theater was completely destroyed.
When Dade County eventually filed a condemnation suit to take Anhoco's fee in the right-of-way of former S.R. 826, as well as Anhoco's rights of access, the Road Department had eliminated the land service road and instead constructed a service road across the front of Anhoco's property which provided Anhoco with direct access to the new limited access highway. The county claimed that, since Anhoco now had access to the new highway, it should not be entitled to compensation for the prior temporary loss of access to its property. A jury agreed, and the Third District affirmed. We quashed the Third District's holding on this issue and found that "the right of access was destroyed [albeit temporarily] not merely regulated." We held that Anhoco was entitled to damages for the destruction of its rights of access prior to the establishment of the new service road. Id. 397 P.2d at 798.
Here, unlike the situation in Anhoco, petitioners' access to S.R. 84 was not completely destroyed, even temporarily. Rather, the lanes of the existing highway, which abutted the properties, were temporarily changed into a service road which provided continuing access to the existing highway, S.R. 84. At no time in Anhoco did the government provide the property owners with a temporary service road with access to the highway. Rather, the loss of access was complete, although temporary. In fact, we noted in Anhoco that the completion of the service road, which provided Anhoco with access to the highway, had effectively remedied Anhoco's access problem:
In this instance the right was not permanently destroyed. However, the fact that the condemning authorities subsequently provided a substituted type of access which should have been provided originally will not suffice to compensate for the harm which was done in the interim. Stock v. *1270 Cox, 125 Conn. 405, 6 A.2d 346 [(1939)]; Casa Loma Springs Development Co. et al. v. Brevard County et al., 93 Fla. 601, 112 So. 60 [(1927)]. We should interpolate, of course, that when assessing any damages suffered Anhoco is not entitled to recover for losses occasioned merely by the customary limitations on the flow of traffic over a highway which is being constructed under so-called "traffic conditions." Every business abutting an established highway which is being reconstructed suffers the same type of loss. To this extent any damage suffered is damnum absque injuria.
Id. at 799.[4] This latter comment in our Anhoco opinion is also relevant here.

HIGHWAY CONSTRUCTION
It is impossible not to be sympathetic to the plight of the landowners here. Few businesses have the resiliency to survive several years of a massive highway construction project on their doorsteps. However, each of the property owners here was in much the same position as its neighbors. Further, although the effects on their properties may have been more severe in degree than other businesses and landowners who were similarly situated, the effects were of the same general nature suffered by their neighbors.
Traditionally, property owners have borne a heavy burden in establishing that their properties have been constructively taken as a result of such government activity. We have long adhered to the principle that "[i]f injury or inconvenience is the same in kind as that suffered by others similarly situated, but different only in degree, compensation is not recoverable." Anhoco, 144 So.2d at 798. We restated that principle in Tessler:
A landowner must demonstrate that he has suffered special damages which are not common to the general public... . The fact that a person loses his most convenient method of access is not such damage which is different in kind from damages sustained by the community at large where his property has suitable access from another street even though the alternate route is longer.
538 So.2d at 849 (quoting Pinellas County v. Austin, 323 So.2d 6, 8-9 (Fla. 2d DCA 1975)) (citations omitted); see also 2A Julius L. Sackman, Nichols' The Law of Eminent Domain § 6.08[2] (rev. 3d ed. 1995) ("[W]hen there is no appropriation of land ... it is generally held that the consequential damage must be special and peculiar to the impacted property or else there can be no recovery.") (footnote omitted).
Highway and street construction necessarily disturbs traffic flows and access to businesses located in the vicinity. To make the State or a local public agency liable for damages caused by all road construction would place an impossible burden upon the taxpayers, would reduce the number of projects that increase road safety, and would hamper the expansion of the system of public roads. See Berman Corp. v. State ex rel. State Highway Comm'n, 24 Or. App. 813, 547 P.2d 192, 194 (1976). Or, as put more bluntly by another court, to hold the State liable for damages from road construction which renders access to property less easy but which does not actually or virtually destroy access to the highway "would require the State to pay through the nose for the privilege of further improving and adding to the safety of highways which it has built and which have evidently brought customers to the doors of the owners of land fronting on such highways." Langley Shopping Center, Inc. v. State Roads Comm'n, 213 Md. 230, 131 A.2d 690, 693 (1957).
Generally speaking, "the privilege of receiving the benefits of life within a municipality or other governmental jurisdiction carries with it certain attendant burdens, including the obligation to suffer the inevitable inconvenience associated with public works construction without compensation." 2A Julius L. Sackman, Nichols' The Law of Eminent Domain § 6.09[2] (rev. 3d ed. 1995). In other words:

*1271 Consequential damages to adjoining property owners in the way of diminution of business while construction is in progress does not constitute a taking of property for which compensation must be made under the Fifth Amendment of the Constitution. Such losses are damnum absque injuria and unfortunately must be borne by the individual as part of the price that he pays for being a member of organized society and living in an urban community.
Id. (quoting Meyers v. District of Columbia, 17 F.R.D. 216, 217 (D.D.C. 1955) and citing cases from 13 other states); see also Anhoco, 144 So.2d at 799.

CONCLUSION
As explained above, we answer the certified question in the negative and find that DOT's activities in this instance did not constitute a compensable taking of access. We therefore approve the district court's decision.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN and HARDING, JJ., concur.
WELLS, J., concurs specially with an opinion, in which GRIMES, C.J., concurs.
WELLS, Justice, specially concurring.
Though I agree with the well-reasoned opinion of the majority, I find this to be a very harsh result. I believe though that it is for the legislature to develop a statutory basis for payment of losses suffered by land owners who suffer because of long but temporary disruptions of the use of their property because of road construction such as occurred here.
GRIMES, C.J., concurs.
NOTES
[1] A loss of access may occur in any number of ways: a legislative act may limit driveway openings; the abutting street may be closed off in one direction so that the land is more or less a cul-de-sac; streets beyond the abutting street may be closed; traffic regulations, either physical (e.g., a traffic median) or legislative (e.g., a one-way street), may be imposed; the grade of the abutting street may be raised or lowered; or the abutting street may be narrowed. William B. Stoebuck, Nontrespassory Takings in Eminent Domain 34 (1977); cf. Pinellas County v. Austin, 323 So.2d 6, 9 (Fla. 2d DCA 1975) (holding that when dirt road, which provided landowners access to their property, was vacated by public body and remaining access to the landowners' home and bulk of land was by small wooden bridge, which could not support heavy vehicular traffic, the landowners suffered special damages).
[2] Cf. Commerce Land Corp. v. Pennsylvania Dep't of Transp., 34 Pa.Cmwlth. 356, 383 A.2d 1289 (1978) (holding that median strip merely restricted ingress and egress to vehicles traveling in southerly direction and in view of alternate routes available to obtain northbound access, each involving circuitous travel amounting to 2.35 and 2.80 miles, respectively, the restriction was not so unreasonable as to constitute "taking" within meaning of statute, even taking into account nature of use of land as truck terminal).
[3] See James v. State ex rel. Idaho Bd. of Highway Directors, 88 Idaho 172, 397 P.2d 766 (1964); see also 2A Julius L. Sackman, Nichols' The Law of Eminent Domain § 6.09[1] (rev. 3d ed. 1995) ("Although there appear to be some exceptions to the general principle, roadway abandonment, construction or realignment which results in inconvenience or mere circuity of access to abutting landowners does not give rise to a compensable injury. At a minimum, this appears to be the rule in those cases where alternative public roadway access to the impacted property remains after giving effect to the governmental action.") (footnote omitted).
[4] Black's Law Dictionary defines "damnum absque injuria" as a "loss or injury which does not give rise to an action for damages against the person causing it." Black's Law Dictionary 393 (6th ed. 1990).