DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**WESLEY CLARK, JR.,**
Appellant,

v.

**CITY OF PEMBROKE PINES,**
Appellee.

No. 4D18-3549

[February 26, 2020]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; William W. Haury, Judge; L.T. Case No. 15-008766 (18).

Suzanne M. Driscoll and Josh A. Rubin of Shutts & Bowen LLP, Fort Lauderdale, for appellant.

Christopher J. Stearns of Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A., Fort Lauderdale, for appellee.

KLINGENSMITH, J.

Wesley Clark, Jr., is the owner of residential property in the Town of Southwest Ranches ("the Town") that abuts an unpaved gravel road with a public twenty-foot right-of-way. The midline of that road, SW 54th Place, serves as the municipal boundary between the City of Pembroke Pines ("the City") and the Town. Specifically, the northern ten feet of the road lie within the City and the southern ten feet lie within the Town. Clark alleged the changes the City made to that road limited his access and impaired the use of his property. He filed an inverse condemnation claim against the City claiming that its actions were a substantial deprivation of his property access and amounted to a taking. The trial court disagreed. Based on the record, we reverse.

This dispute began after the Town closed several roads that provided the only direct means of northbound travel for residents in the City's Durango and Trails living communities, located east of Clark's property. As a result, these residents were forced to travel west on SW 54th Place in front of Clark's house to access another road to proceed north. Due to

the increased traffic on SW 54th Place, Clark and his neighbors installed a gate and "private road signs" to limit public access to this road, thus preventing Durango and Trails residents from accessing their only direct means of northbound travel.

To provide direct northbound access for the Durango and Trails residents, the City opted to purchase the property abutting the north side of SW 54th Place, which was inside its boundaries, with an eye toward creating a road heading south from Griffin Road and turning east to connect to SW 54th Place. The north-south portion of the new road was named SW 207th Terrace, and the east-west portion was named New SW 54th Place.[1] This east-west portion of New SW 54th Place was built on the northern ten feet of the previous SW 54th Place right-of-way on land now owned by the City. When construction was completed on New SW 54th Place, the City procured the installation of concrete barriers to separate New SW 54th Place from Old SW 54th Place. These barriers were angled in such a way as to prevent access from Old SW 54th Place to New SW 54th Place.

According to the City's Engineer, the City Manager of Pembroke Pines requested the barriers to "prevent the three house[s] on the south side [of Old SW 54th Place] from having access to the new road." One of those houses was Clark's. Before the City's road construction, Clark had unrestricted access to SW 54th Place in front of his home. Afterwards, he said the barriers significantly impeded his travel because with them in place, Old SW 54th Place effectively became a "one-way, ten-foot-wide road" with no room for vehicles to turn around. Additionally, Clark's only direct means of east and southbound travel—via SW 199th Ave— was eliminated. Further, his access to his property was limited to the now ten-foot east-west right-of-way that was Old SW 54th Place. While Clark's ease of travel was impeded, at no point was he unable to get on and off his property with his personal vehicle. However, Clark had difficulty maneuvering his truck off his property and was unable to get his boat and trailer off his property. Clark also had difficulties with his garbage pickup, mail delivery, and emergency vehicle access. Only after a medical incident involving Clark's mother did the City agree to create a barrier opening for "emergency operation only" to facilitate better access by rescue vehicles. However, this opening was closed shortly thereafter because vehicles were improperly using it as a "thoroughfare" to access SW 208th Lane.

---

[1] The portion of SW 54th Place that abuts Clark's property will now be referred to as "Old SW 54th Place."

The City then sold the property on the northern side of the right-of-way (the property it had purchased to construct New SW 54th Place) to Franklin Academy and created a parcel called the Franklin Plat. Now, the north ten feet of SW 54th Place abutting the Clark property (which was the eastbound lane of New SW 54th Place) was within the boundary of the Franklin Plat. As a condition of sale, Franklin Academy was required to maintain New SW 54th Place as a private road with an access gate to restrict its access to the residents of the Durango and Trails living communities.

Eventually, the City approved an agreement to shift New SW 54th Place to the north and out of the twenty-foot right-of-way for SW 54th Place. The concrete barriers were removed, and an aluminum guardrail was installed along the south perimeter of the newly-realigned road, maintaining its exclusivity for the use of City's residents.

Although this realignment restored Clark's twenty-foot right-of-way on SW 54th Place, the new guardrail separating Old SW 54th Place from New SW 54th Place continued to block Clark's eastbound travel on SW 54th Place and eliminated his only direct means of southbound travel. According to Clark, his mail and garbage delivery continued to be sporadically disrupted.

Clark filed suit against the City seeking declaratory and injunctive relief. Clark also filed an inverse condemnation claim based on the City's alleged taking of his property. After bifurcating the claims seeking declaratory and injunctive relief, the lower court held a three-day non-jury trial on Clark's inverse condemnation claim. The court found that Clark did not suffer a substantial deprivation of his right of access as a result of the City's actions.[2] Specifically, it noted that Clark's access was "substantially the same as it was prior to the existence of New SW 54th Place" and that he failed to show "that the City's actions destroyed or substantially diminished access to his property." This appeal followed.

"[I]n an inverse condemnation proceeding of this nature, the trial judge makes both findings of fact and findings of law." *Palm Beach Cty. v. Tessler*, 538 So. 2d 846, 850 (Fla. 1989). "Based upon the facts as so determined, the judge then decides as a matter of law whether the landowner has incurred a substantial loss of access by reason of the governmental activity." *Id.* Therefore, the question of whether a

---

[2] After this decision, Clark voluntarily dismissed the counts for declaratory and injunctive relief but moved for reconsideration of the inverse condemnation claim. The motion was denied.

"substantial loss occurred" is a question of law to be reviewed *de novo*. *See State, Dep't of Transp. v. Gayety Theatres, Inc.*, 781 So. 2d 1125, 1127 (Fla. 3d DCA 2001) (citing *Tessler*, 538 So. 2d at 850).

The Florida Constitution provides that: "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner." Art. X, §6(a), Fla. Const. Thus, "where a government agency, by its conduct or activities, has effectively taken private property without a formal exercise of the power of eminent domain, a cause of action for inverse condemnation will lie." *Rubano v. Dep't of Transp.*, 656 So. 2d 1264, 1266 (Fla. 1995). "Proof that the governmental body has effected a taking of the property is an essential element of an inverse condemnation action." *Id.*

There is little dispute that Clark's ability to fully use his property as he had before was impacted by the City's actions. The question is whether it was significant enough to constitute a taking. "A taking may occur in a wide variety of circumstances and may be either temporary or permanent. For example, a taking may occur when governmental action causes a loss of access to one's property even though there is no physical appropriation of the property itself." *Id.* at 1266-67 (footnote omitted). This is because "the right of access is a property right which appertains to the ownership of land." *Tessler*, 538 So. 2d at 848. Thus, "where access [to a property] is entirely cut off, a taking has occurred." *Id.* A taking may also occur even if there is not "complete loss of access to the property." *Id.* at 849. However, that property owner's right of access must be "substantially diminished." *See id.* Additionally, the property owner "must demonstrate that he has suffered special damages which are not common to the general public." *Id.* (quoting *Pinellas Cty. v. Austin*, 323 So. 2d 6, 8 (Fla. 2d DCA 1975)).

"[T]he fact that a portion or even all of one's access to an abutting road [is] destroyed does not constitute a taking" if "other suitable access continues to exist." *Id.* Thus, "the loss of the most convenient access" is often not compensable. *Id.* Further, a taking does not occur when the government exercises its "police power to regulate the flow of traffic or to control the operation of traffic or to prescribe reasonable limitations on the number of driveways or access facilities that might be allowed an abutting owner adjoining a land service highway." *Anhoco Corp. v. Dade Cty.*, 144 So. 2d 793, 798 (Fla. 1962). Common exercises of this police power include "such regulations as prohibiting U turns or left turns, or establishing oneway traffic or specifying the location of driveways in and

4

out of abutting property[.]" *Id.* Accordingly, enacting these regulations "require no compensation to abutting owners." *Id.*

In *Anhoco*, a theatre was forced to shut down temporarily because Dade County's construction made it impossible for patrons to exit and enter the theatre. *Id.* at 794. Although, a frontage road was built to provide the theatre's patrons access a year later, the Florida Supreme Court held that Dade County was liable to the theatre for the temporary encroachment on its right of access. *Id.* at 797. In finding for the theater, the Court noted that it was not "confronted by the exercise of the police power to regulate the flow of traffic or to control the operation of traffic," because the theatre's right of access was "destroyed not merely regulated." *Id.* at 798.

In *Austin*, the Second District encountered a similar case to the one presented here. There, the court ruled that the plaintiffs were entitled to compensation for their diminished quality of property access even though their access was not destroyed. 323 So. 2d at 9. The plaintiffs owned a five-acre parcel of land in Pinellas County. *Id.* at 8. The County vacated certain portions of streets which led to the plaintiff's land. *Id.* With this vacation, the plaintiffs only had two means to access their property: (1) a dirt road to the north of the property, and (2) a street along the southern border which was only navigable by way of a small wooden bridge over a canal. *Id.* This bridge was not adequate to support heavy vehicular traffic such as garbage trucks or fire trucks. *Id.* at 9. Although the Second District conceded that the plaintiffs were not totally deprived of access, recovery was permitted because the owners "suffered a sufficient impairment of their right of access as to be different in kind from the public at large." *Id.*

In *Tessler*, the Florida Supreme Court established several new precepts from *Anhoco*, *Austin*, and other inverse condemnation cases. *See Tessler*, 538 So. 2d at 848-49. There, Palm Beach County constructed a wall in front of a beauty salon which blocked the salon's access to, and visibility from, the main road. *Id.* at 847. With the wall in place, the salon's owners, workers, and patrons could only access the business via an indirect winding route of over 600 yards through a residential neighborhood. *Id.* The Court opined that this "tedious and circuitous route" was "patently unsuitable and sharply reduce[d] the quality of access to [the plaintiff's] property." *Id.* at 850. The Court also noted that the wall blocked the visibility of the commercial storefront. *Id.* After establishing that a property owner's right of access must be "substantially diminished" in light of their other property access to

5

constitute a compensable taking, the Court found that the plaintiffs met this standard and allowed recovery against the County. *Id.*

After *Tessler,* the Florida Supreme Court revisited the issue of what constitutes a compensable taking in *Rubano.* There, the owners of five commercial properties brought inverse condemnation actions alleging that the diminished access to their properties during a Department of Transportation ("DOT") construction project amounted to a taking. *Id.* at 1265. During this construction project, the DOT eliminated the properties' access to State Road 84 ("SR 84") and created a temporary service road for the properties' patrons to use. *Id.* at 1266. Utilizing this service road, patrons traveling on SR 84 had to travel an additional one-and-a-half miles to a U-turn to access their properties. *Id.* The DOT's service road also eliminated all connection from SR 84 to the main highway. *Id.* Thus, all patrons traveling from that highway had to travel an additional two-and-a-half miles to access the properties. *Id.* The Court held that the DOT's actions did not amount to a taking. *Id.* It compared the case to *Tessler* where the plaintiff was denied direct access to its salon. *Id.* at 1267. In contrast to the plaintiff in *Tessler,* the Court noted that the owners and patrons in *Rubano* were only denied the "most convenient access" to their properties, unlike the *Tessler* plaintiff whose access was virtually eliminated, because the DOT's service road provided alternate "suitable access." *See id.* at 1267-69. Further, the Court clarified that recovery in inverse condemnation suits of this nature would only be allowed under "narrow facts," such as those present in *Tessler.* *Id.* at 1267. It reasoned that making "the State or a local public agency liable for damages caused by all road construction would place an impossible burden upon the taxpayers, would reduce the number of projects that increase road safety, and would hamper the expansion of the system of public roads." *Id.* at 1270. Thus, to the Court, any inconvenience to the plaintiffs was simply an obligation they had to suffer to receive "the benefits of life within a municipality or other governmental jurisdiction[.]" *Id.*; *see also State, Dep't of Transp. v. Gayety Theatres, Inc.,* 781 So. 2d 1125, 1126-27 (Fla. 3d DCA 2001) (finding that a concrete median which prevented northbound traffic from entering the theatre and increased patrons' northbound route by a half mile, was a "non-compensable modification of traffic flow").

We find *Rubano* distinguishable on its facts. As an initial matter, Clark lost more than just the "most convenient access" to his property: the City's barriers "substantially diminished" his access. *See Tessler,* 538 So. 2d at 849; *State Dep't of Transp. v. Kreider,* 658 So. 2d 548, 549 (Fla. 4th DCA 1995) (stating that "[t]he trigger for beginning a *Tessler* analysis [is] the destruction of direct access to property from an abutting

6

road"). The City constructed the barriers within Clark's twenty-foot right-of-way, which was referenced in his deed. Thus, Clark had a property interest in this right-of-way easement, and it was integral to his ingress and egress. *See Fla. E. Coast. Ry. Co. v. Worley*, 38 So. 618, 621 (Fla. 1905); *accord Benerofe v. State Road Dep't*, 217 So. 2d at 838, 839 (Fla. 1969). The barriers obstructed that ingress and egress and turned Old SW 54th Place into a "one-way, ten-foot-wide road" with no room for vehicles to turn around. Accordingly, the City's destruction of Clark's access to SW 54th Place resulted in a compensable taking.

In addition to disrupting his property access, the City's barriers also impeded Clark's use and enjoyment of his property in two material ways. First, Clark could not utilize his truck, boat, and trailer anymore. Second, and more importantly, the barriers disrupted some of Clark's municipal services. *See Austin*, 323 So. 2d at 9. Clark's mail was not delivered regularly until he moved his mailbox up against the barrier. Even after moving his mailbox, Clark's mail delivery continued to be sporadic. *See id.* Clark was also forced to transport his garbage to a point away from his property where the garbage truck could retrieve it. *See id.* Additionally, his emergency medical access was impacted. There were two instances in which emergency medical personnel had to scale the barriers because they obstructed direct access to Clark's property. *See id.* Even though the City did not completely deprive Clark of all access to his property, Clark is only required to prove a "substantial loss of access" to succeed on a claim of inverse condemnation. *See Tessler*, 538 So. 2d at 849. We find Clark has met this requirement. *See id.*

The impairment of Clark's access was more than a mere "aggravation and inconvenience" of having to "travel a less convenient route." Again, unlike the claims in both *Rubano* and *Gayety Theatres*, Clark's claim involves more than just less-convenient access to his property—his municipal services were also disrupted as a direct result of the City's activities on the land taken. *See Austin*, 323 So. 2d at 9 (allowing recovery where plaintiffs had to traverse a less convenient route and their municipal services were disrupted). The fact that the City subsequently restored Clark's twenty-foot right-of-way after erecting barriers, and then guardrails, does not change the fact that Clark suffered damage to his right of access in the interim. *See Rubano*, 656 So. 2d at 1266; *Anhoco*, 144 So. 2d at 797. The City's destruction of Clark's access to eastbound SW 54th Place involves more than just an exercise of "police power to regulate the flow of traffic or to control the operation of traffic." *See Anhoco*, 144 So. 2d at 798. Because the barriers only impede Clark's property, he has shown that he "has suffered special damages which are not common to the general public." *See Austin*, 323 So. 2d at 8.

7

Therefore, Clark is entitled to be compensated for the harm that the City's barriers and guardrail caused him.  *See id.* at 9.

In conclusion, the City's actions in physically taking Clark's property access with the imposition of its barriers, taking Clark's right-of-way easement by selling it to Franklin Academy, and causing a substantial loss of access in the diminished use and benefit of the property and attendant municipal services warranted a finding of inverse condemnation.  Accordingly, we reverse the trial court's finding to the contrary and remand for proceedings consistent with this opinion.

*Reversed and remanded with instructions.*

GROSS and KUNTZ, JJ., concur.

\*        \*        \*

***Not final until disposition of timely filed motion for rehearing.***