747 So.2d 395 (1998)
TOWN OF JUPITER, a municipal corporation, Appellant,
v.
Michele ALEXANDER, as Trustee, Appellee.
No. 96-1693.
District Court of Appeal of Florida, Fourth District.
September 16, 1998.
Opinion Denying Rehearing November 12, 1998.
*396 Susan L. Trevarthen and Nancy E. Stroud of Burke, Weaver & Prell, Boca Raton, and Thomas J. Baird, North Palm Beach, for appellant.
John Beranek of Ausley & McMullen, Tallahassee, and Fred H. Gelston of Damsel & Gelston, West Palm Beach, for appellee.
Thomas G. Pelham, Shaw P. Stiller and James Paull, IV of Apgar & Pelham, Tallahassee, and Jane Hayman, Deputy General Counsel, Tallahassee, for amicus curiae Florida League of Cities, Inc.
Stephanie M. Gehres, General Counsel, and Ross Stafford Burnaman, Assistant General Counsel, Tallahassee, for amicus curiae Department of Community Affairs.
WARNER, Judge.
This is the second appearance of this case in our court. In Alexander v. Town of Jupiter, 640 So.2d 79 (Fla. 4th DCA 1994)("Alexander I"), we held, contrary to the determination of the trial court, that the "ripeness doctrine" did not preclude consideration of an inverse condemnation claim for a temporary regulatory taking. We remanded the case for the trial court to determine whether a temporary taking had occurred in this case. On remand, a successor trial judge, after reviewing the prior proceedings, found a temporary taking and, consequently, ruled in favor of appellee and set the matter for a trial on damages. We have jurisdiction to consider the appeal of that order under Florida Rule of Appellate Procedure 9.130(a)(3)(C)(iv), and we hold that the trial court erred. Specifically, we hold that *397 appellee's two parcels should be considered part of a single tract for purposes of a takings analysis. Because the appellee was not deprived of all use of both parcels, no compensable taking occurred.
On June 3, 1988, appellee, Michele Alexander ("Alexander"), contracted with the owners of record, Mary and Richard Fullerton, to purchase property in the Town of Jupiter ("Town"), consisting of (1) a mainland parcel located between, and fronting on, Alternate A-1-A and the Loxahatchee River near the southern end of the Alternate A-1-A bridge over the river, and (2) an island, known as either Sawfish Bay Island or Fullerton Island, located about 500 yards southeast of the mainland parcel and adjacent to the western edge of the navigable Intra Coastal Waterway channel. The mainland parcel is between .3 and .4 acres in area; the island is about 12 acres in area, of which eight acres is dry upland while the rest is submerged bottomlands. Mary Fullerton had acquired the island property by deed from the state of Florida in 1961, and her son acquired an interest in both the mainland and island properties in 1976. On May 31, 1988, Richard and Mary Fullerton reconveyed both the mainland parcel and the island to themselves as joint tenants with right of survivorship. They then executed a contract of sale to Alexander.
The purchase price for both parcels was $2,220,000. The contract was subject to zoning restrictions, prohibitions, and other requirements imposed by government authority. Alexander was to place in escrow $5,500 as a payment toward the purchase price. She was given time to determine whether the island parcel had sufficient acreage and buildable lots to meet the contract requirements, at which point she was required to place additional monies in escrow.
At the time this contract was executed, the parcels were vacant. There is nothing in the record about previous use, beyond the fact that there is a dock on the mainland parcel. The island is known to have been used occasionally by boaters and Boy Scouts for camping and other passive pursuits. The island is heavily covered with mangroves, Australian pines and other vegetation and lacks direct access from the mainland other than by boat.
Under the Town's zoning ordinance, the mainland parcel was zoned C-2, which permits intensive development for hotels, retail stores or office buildings. The island was classified R-1, which allows single family residential units on lots of not less than 10,000 square feet, or approximately four units per acre, unless part of a Planned Unit Development (PUD).
In 1984, the Town considered changing the zoning of the island to rural residential in connection with its amendments to the 1978 comprehensive land use plan. The Town's 1985 revised comprehensive plan envisioned classification of the island for recreational and conservational use, as the island is located within the 100-year flood plain of the Loxahatchee River. This classification allows residential development, but the density is to be determined by applying a variety of criteria on a property by property basis. The minimum lot size within that classification is one acre, except in the case of a PUD, where density may be twice that.
After executing the purchase agreement, Alexander immediately incurred the disfavor of the Town by attempting both clearing activity on the island and repair of the mainland dock without permits. It was at that time that she was informed of the inconsistency between the island zoning and the comprehensive plan, which would have to be resolved before development was allowed. Subsequently, the Town began working on resolving the inconsistency.
Alexander then retained counsel, who arranged a meeting on August 30, 1988 *398 among his client, her consultant, and several Town staff or officials. At this meeting, a Town official informed Alexander that an alternative approach available to her was to apply for a change of land use designation in the Town's comprehensive plan for the island parcel. The deadline for the then current window of opportunity was September 30, 1988. Normally it takes five or six months for the process to be completed. Alexander's lawyer filed such an application, seeking a change of designation for the island to R-1 residential.
On October 28, 1988, while Alexander's application for change in land use designation was pending, she submitted a proposed site plan to the Town for developing the property. Under this plan the island portion would have 23 residential lots, and support facilities would be located on the mainland parcel. The latter would include a covered parking structure, dumpsters, and a dock for a passenger ferry that would carry people to and from the island. She offered to furnish the Town with a police boat to serve the island, and also to house a fire-rescue vehicle there.
On November 7, 1988, the Town wrote Alexander saying that the site plan approval application could not be processed because of the inconsistency between the zoning and land use designations. In the letter, the Director of Public Services indicated that Alexander's pending land use amendment application might resolve the inconsistency. However, on November 8, 1988, the Town's Planning and Zoning Commission denied the application for change of the land use designation.
Alexander and her attorney attended a November 15, 1988 meeting of the Town Council. After counsel told them about Alexander's applications and what had happened with them, the council indicated that she could be granted a limited clearing permit. She then applied for and received a permit to clear and remove dead trees and vegetation. On November 28, 1988, at another Town Council meeting, it was suggested to Alexander that she explore a transfer of development rights from the island to some other parcel. She did explore this with Town staff over the next few months, and it looked promising; but Town's counsel still believed this, too, would be prevented by the inconsistency between the land use plan and the property's zoning classification.
Subsequently, Alexander changed her development plan. She requested a variance for the mainland portion of the property so that an office building could be constructed there. Some adjoining lots would be included so that the mainland lot would be 1.2 acres. The plan called for extra parking for the island and a dock for residents of the island. The Town staff reviewed this variance request and were concerned about density and insufficient parking. The Planning and Zoning Commission recommended denial. The Town Council did not vote on this variance request.
Next, Alexander and her representatives submitted a new site plan for a hotel on the mainland with amenities in support of the hotel to be located on the island. It was studied for about eight months, and several hearings of the planning board were held to discuss it.
Meanwhile, on May 19, 1989, Alexander had executed a superseding contract with the Fullertons, dropping the purchase price to $1,500,000 and the down payment to $500. An addendum provided for an automatic six-month extension of the stated closing date if the buyer filed a complaint against the Town in an effort to obtain a site plan.
On August 10, 1989, Alexander filed still another application for site plan approval. This plan called for ten residences on the island, with parking and the ferry dock on the mainland parcel. Then Alexander filed again for mandamus to compel the Town to approve the latest site plan.
The Town enacted, on March 1, 1990, a zoning ordinance amendment creating a *399 conservation/residential zoning classification and applying it to the island parcel. Alexander then modified her latest site plan approval petition to an application under the new conservation/residential category. On May 15, 1990, the Town by ordinance granted Alexander a special exception to develop the property, and on May 21, 1990, an agreement for the development was entered into between Alexander and the Town. This agreement allowed her to develop both parts of the property, with ten garages and second-floor offices on the mainland portion and ten homesites, docks and an open recreation area on the island. Alexander subsequently received a clearing permit, and her platting of the island was approved in late 1991.
After receiving all of her approvals, Alexander filed an action for inverse condemnation against the Town for the deprivation of the use of the island for the two years it took to obtain development approvals. At the end of the initial trial, the court determined that the case was precluded by the "ripeness doctrine" in that the Town had not reached its final decision on the application of zoning ordinances to the property until 1990 when it approved Alexander's development.
In Alexander I, we determined that the final determination requirement was not applicable to temporary takings where all use of the property was prevented by government action. Therefore, the "ripeness doctrine" did not prevent the determination of whether a taking had occurred. Moreover, we commented on several alternative arguments that the Town had made in its brief to support an affirmance, rejecting each as requiring additional factual determinations, which the trial court had not made when it decided the case on "ripeness" grounds. See id. at 82-83. Those arguments included whether the two parcels should be considered for condemnation purposes as a single tract because Alexander had never been precluded from developing the mainland parcel. The Town also contended that because of the nominal deposit on the property, Alexander did not have any reasonable investment backed expectation in the property subject to a taking. Finally, the Town argued that the two year delay was a "normal delay" in land use planning within the meaning of First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987).
On remand, the parties submitted the case to a successor judge to determine whether a taking had occurred. They agreed that the successor judge could make that determination from the record in the prior proceeding. In their argument before the successor judge, among other issues, the Town and Alexander debated whether the two parcels were a single tract, the extent to which the Town's actions had frustrated Alexander's reasonable investment backed expectations, and the issue of "normal" planning delays. After taking the case under advisement, the court issued its ruling, finding that a taking had occurred as to the island parcel. The order did not address directly any of the parties' arguments or provide the factual predicate for the ruling.
Although generally decisions of the trial court come to this court with a presumption of correctness, in the instant case that presumption is slight at most. Where a trial court rules on the basis of a written record and not on testimony requiring credibility determinations, the appellate court has before it everything the trial court reviewed, and we have the same opportunity to weigh it as the trial court did. See West Shore Restaurant Corp. v. Turk, 101 So.2d 123, 126 (Fla.1958); Ciba-Geigy Ltd. v. Fish Peddler, Inc., 691 So.2d 1111, 1114 (Fla. 4th DCA), rev. denied, 699 So.2d 1372 (Fla.1997); Terrace Bank of Florida v. Brady, 598 So.2d 225, 227 (Fla. 2d DCA 1992). This is particularly true in the instant case because, not only did the trial court rule based solely on the record and arguments made by the lawyers, but the court did not make any findings of fact in its order determining that a taking had occurred.
In Reahard v. Lee County, 968 F.2d 1131, 1136-37 (11th Cir.1992), the *400 court of appeals reversed the takings order of a federal magistrate because the magistrate had failed to make adequate factual findings or any takings analysis in its opinion. While appellant suggests that the trial court's order is inadequate for the same reasons, there is no requirement in law for specific findings of fact as to such an order. Findings of fact and an analysis by the trial court are, however, extremely helpful to appellate court review. Without them, the appellate court may not understand the logic the trial court perceived in its result. Where they are absent, the appellate court must determine whether, based upon the record, the proper analysis would have produced the result reached by the trial court. This is what we must undertake in the instant case.
The Town argues that the island and the mainland parcel should essentially be considered as one for purposes of a takings analysis. If the Town is correct, then no taking occurred because Alexander could have developed the mainland parcel at any time. Thus, she was not deprived of all use of her property, the essential prerequisite for a temporary takings claim. See First English, 482 U.S. at 322, 107 S.Ct. 2378. Alexander initially claims in her brief that this issue was not raised in the trial court. In Alexander I,we specifically stated that this issue required the application of factors which should be decided by the trial court on remand. See 640 So.2d at 82. The parties both briefed this issue and argued its merits to the trial court, and we find no objection by Alexander's attorneys to the court's consideration of the issue either in her memorandum of law on the issue or in her counsel's argument at the hearing. We therefore find that the issue has been properly preserved for appeal.
Department of Transportation, Division of Administration v. Jirik, 498 So.2d 1253, 1255-56 (Fla.1986), established criteria for determining whether parcels were separate or unified for purposes of determining whether a taking has occurred. In Jirik, a property owner owned three adjoining lots. The construction of a bridge eliminated access to lot one and impaired access to lot two. The property owner brought an inverse condemnation action, claiming that lots one and two were taken as a result of the bridge project. The Department treated all three lots as one parcel owned by the property owner, and because the owner still had access to the parcel through lot three, it claimed that no taking had occurred.
The court looked to three factors to determine whether the adjoining parcels were separate and independent or a single tract: physical contiguity, unity of ownership, and unity of use. See id. at 1255. Noting that the factor most often controlling was whether the parcels had a single unity of use, the court adopted a "presumption of separateness" as to vacant, platted city lots. See id. at 1257. Considering the facts of Jirik, the court found that the three lots did not have a unity of use, nor had they been treated as a single tract. See id. Instead, the property owner could have sold each vacant lot separately. Significantly, the court noted that "the parcels do not depend on one another for reasonable use." Id. at 1257.
Other factors to be considered in determining whether a unity of use exists appear in the third district court's opinion in Jirik, approved by the supreme court. See Division of Admin. v. Jirik, 471 So.2d 549, 554-55 (Fla. 3d DCA 1985). These include: (1) intent of the owner, (2) the adaptability of the property, (3) the dependence between parcels, (4) the highest and best use of the property, (5) zoning, (6) the appearance of the land, (7) the actual use of the land, and (8) the possibility of tracts being combined in use in the reasonably near future. See id.
Applying the criteria to the instant case, the parcels are not physically contiguous in the ordinary sense since they are *401 separated by a body of water. However, tracts physically separated from each other may constitute a single tract if put to a single integrated use. See id. at 552; Baetjer v. United States, 143 F.2d 391, 394-95 (1st Cir.1944). In Baetjer, the property owner owned an island off the coast of Puerto Rico, together with property on Puerto Rico. In connection with a claim for severance damages, the court held that the trial court erred in ruling that no severance could be considered. Instead, the trial court should have considered whether, as a matter of fact, in spite of the lack of physical contiguity, "their holdings by reason of the uses to which they were being put, or would probably be put in the reasonably near future, constituted a single, integrated, unitary tract." Id. at 395. Thus, while the instant parcels are not physically contiguous, this criterion is not dispositive where the intended use is to integrate the two parcels.
Secondly, the court must consider unity of ownership. In the instant case, the parcels were both owned by the Fullertons and were subject to one purchase contract by Alexander. A single price was negotiated for both parcels. As we noted in City of Riviera Beach v. Shillingburg, 659 So.2d 1174, 1183 (Fla. 4th DCA 1995), the conveyance of property by a single deed or contract suggests that property conveyed thereunder is considered as a whole and not for separate treatment. Similarly, in this case, there is no suggestion that the parcels under the contract were not conjoined, and they were treated as integrated for purposes of the purchase.
Finally, we come to an analysis of whether or not there was a unity of use between the parcels such that they should be treated as a single tract. We first look at the intent of the owner. The "owner" seeking compensation for inverse condemnation is Alexander, a contract purchaser. All plans submitted to the Town by Alexander contemplated that the mainland parcel would furnish support to the island parcel or vice versa. In fact, the plan that the Town approved established the mainland parcel as supporting the island residences. There is no evidence in the record that Alexander ever intended or explored separating the parcels. Instead, the contract was contingent on securing the proper approvals for buildable lots on the island. To do that required the use of the mainland parcel for support. Thus, the intent of the owner, as revealed by her development plans, was clearly an integrated use of the two parcels.
From the other factors that the third district noted in Jirik, 471 So.2d at 554, as relevant to determining whether there is unity of use, the subject property was not only adaptable for integrated use, but the development of the island parcel required mainland support. In contrast to the supreme court's findings in Jirik, 498 So.2d at 1257, the island parcel in the instant case depends on the mainland parcel for reasonable use. Although the zoning differed on the two parcels, the "highest and best use" of the island parcel could be achieved only through use of the mainland parcel as support.
Considering all of the Jirik factors, we hold that the two parcels constituted a single integrated tract for purposes of takings analysis. The trial court erred in determining that a taking of the island occurred when the island was part of a larger tract and the Town's regulatory actions did not prevent all development of that tract.
Because of our resolution of the single tract issue, we do not need to address the remaining grounds that the Town has asserted for reversal. Based upon our holding that the two parcels constituted only one tract for purposes of determining whether a taking occurred, we reverse the order of taking and remand for entry of a judgment in favor of the Town of Jupiter.
GUNTHER and SHAHOOD, JJ., concur.

*402 ON MOTION FOR REHEARING

WARNER, J.
On rehearing, the appellee claims that we have abandoned our "holding" in Alexander I that a temporary taking occurred. Appellee misreads Alexander I. In that case we examined whether appellee's temporary takings claim was ripe for adjudication of the compensation claim raised. We held that the denial of all permitting of appellee's property, and consequent denial of all of its use, could constitute a temporary taking where its effect is to prevent all use of the property, for which proposition we cited United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). In that context we stated that the permit denial in this case was governmental regulatory action which amounted to a temporary taking of all use of the property, thereby making the case ripe for adjudication of the compensation claim raised. We emphasize that in Alexander I we were determining only the ripeness issue.
Further, for appellee to suggest that we have decided all of the issues regarding whether a compensable taking occurred disregards all of the specific issues which we had remanded to the trial court for determination. No fair reading of our prior opinion can yield the conclusion that we had determined those very issues.
We thus deny the motion for rehearing. However, appellee points out that there remains pending a cause of action for violation of civil rights. Thus, we withdraw our previous instruction and reverse for entry of a partial final judgment in favor of the Town on the takings issue and remand for further proceedings on the remaining claim.