COHEN, J.
Ocean Palm Golf Club Partnership (“Ocean Palm Golf’) appeals from the final order and judgment entered in favor of the City of Flagler Beach (“the City”) in an action brought by Ocean Palm Golf and Caribbean Condominium Limited Partnership (“Caribbean Condo”) seeking compensation for the City’s alleged taking of two parcels.[1] We affirm.
This is an inverse condemnation case involving two parcels of land located in Flagler Beach. The first parcel is a thirty-four-acre parcel that had been operated as a nine-hole golf course (“the golf course parcel”). The second parcel is a vacant 2.94-acre parcel situated inside the golf course parcel (“the condo parcel”). While the two parcels at issue are now owned by different entities, that was not always the case. For several decades, the golf course parcel and the condo parcel made up a single parcel owned by one entity, Ocean Palm Estates, Inc. (“Ocean Palm Estates”), which was the predecessor in title to Appellant, Ocean Palm Golf. The two parcels had been operated as a golf course for more than forty years. What is now referred to as the condo parcel was the driving range; the remainder of the property was operated as a nine-hole golf course under the applicable recreational zoning designation.[2] Eventually, Ocean Palm Estates, claiming to be losing money on the operation of the golf course, threatened the City with litigation over its refusal to change the zoning from recreational.
To resolve this dispute, the City and Ocean Palm Estates entered into a Development Agreement in 1989. The Development Agreement created a Planned Unit Development consisting of two parcels. The golf course parcel would remain designated recreational in the Comprehensive Plan, and Oceari Palm Estates would continue to operate that parcel as a golf course, which was to be open to the City’s residents. If not operated as a golf course, the golf course parcel would be maintained as an open space. In return, the City would allow residential development on the condo parcel. The Comprehensive Plan designated the condo parcel as “high density residential” and the zoning was changed to RPUD. The building was to not be higher than eighty-five feet, consistent with an attached conceptual plan, and was limited to eighty-four units with a restaurant and golf facilities. The Development Agreement further required the proposed development to be “developed according to.all the applicable zoning and building regulations of the City.” By its own terms, the Development Agreement would expire on July 1, 2003.
In 1999, before it attempted to develop the property, Ocean Palm Estates sold both parcels, deeding the golf course parcel to Appellant Ocean Palm Golf for $1.5 million and the condo parcel to Ocean *466 Palm Condominium Ventures, Inc. (“Ocean Palm Condo”), which was Caribbean Condo’s immediate predecessor in interest. Stephen Cejner was a principal of both Ocean Palm Golf and Ocean Palm Condo, and he is the president of Ocean Palm Golf. Cognizant of the terms of the Development Agreement, he expected to build condominiums on the condo parcel and rehabilitate and operate the golf course parcel; the ability to operate the golf course depended on the ability to sell the eighty-four residential units.
Ocean Palm Condo’s first attempt at development in 2000 resulted in a proposal for an eighty-four-unit condominium tower with a width of 210 feet, with the golf course as an amenity. The City, however, objected to the tower, causing Ocean Palm Condo to fashion a different plan to respond to the City’s concerns.
Ocean Palm Condo’s second attempt at development was not successful, either. Instead of the tower plan, Ocean Palm Condo proposed three connected buildings of 210 feet in length. While Ocean Palm Condo was working to develop the condo parcel, Ocean Palm Golf was actively rebuilding the golf course parcel. Again, the City found fault, concluding that the buildings did not meet the Development Agreement’s conceptual plan.
In 2001, Ocean Palm Condo deeded the condo parcel to Caribbean Condo, which was a partnership formed to own and develop the parcel. The partnership consisted of Ocean Palm Condo, Cejner, Todd Lynch, and others. Lynch’s company, Chase LLC, owns thirty-seven percent of Caribbean Condo. Caribbean Condo was a separate company from Ocean Palm Golf, and neither could control the other. Not everyone who owns part of Caribbean Condo also owns Ocean Palm Golf, and not everyone who has an ownership interest in Ocean Palm Golf also owns a share of Caribbean Condo.
In June 2002, Caribbean Condo made a third development proposal to the City, again proposing a single-tower design. Knowing the Development Agreement would soon expire, Caribbean Condo sought an extension of the agreement while the third proposal was being considered. The City denied the extension, but it did approve the site plan, with conditions attached, including a 150-foot maximum on the building’s length instead of the 210 feet it was designed to be. Caribbean Condo was unable to revise the plan from 210 feet to 150 feet. If it had done so, the other items required by the Development Agreement, i.e., a restaurant, a pro shop, and other amenities, would not fit into the building.
Even though the Development Agreement had expired in July 2003, Caribbean Condo made a fourth attempt to develop the condo parcel in 2004. This time, it proposed a forty-two-unit project only thirty-five feet high and 150 feet wide. To be built, it required that Caribbean Condo purchase one acre of the golf course parcel from Ocean Palm Golf.[3] The City found issues with the plan and asked Caribbean Condo to resolve the issues before the City would reschedule a hearing. Caribbean Condo, unable to resolve the issues, abandoned the proposed plan.
In 2008, Cejner and his group decided to try another approach to development. This time, they abandoned the high-density proposals and tried to get the property “down-zoned” so they could develop single-family residences on both the condo parcel and the golf course parcel.[4] To do so, they *467 had to first get the Comprehensive Land Use Plan amended to make both parcels “low density residential.” The ownership of the two parcels was not, however, merged for purposes of this proposal. In June 2008, they submitted a proposed amendment to the Comprehensive Plan to the City.
The application for the Comprehensive Plan amendment listed Ocean Palm Golf as the owner, even though the application sought an amendment re-designating both the golf course parcel and the condo parcel as “low density residential” with PUD zoning. Moreover, the application listed the number of acres involved as “86.9” without distinguishing between the two parcels.
On October 30, 2008, a public hearing was held on the proposed amendment to the Comprehensive Plan, during which the City considered whether to transmit the proposed amendment to the Department of Community Affairs. Citizens spoke out against the amendment. At the conclusion of the hearing, the City voted against transmitting the proposed amendment.[5]
A second public hearing was held, again drawing strong public opposition to the proposed amendment. The City denied the amendment. Ocean Palm Golf brought suit in the circuit court unsuccessfully, with the court ruling that it was within the City’s discretion to reject the plan amendment.
In February 2010, Ocean Palm Golf and Caribbean Condo jointly filed the instant suit, alleging, in pertinent part, that the City’s refusal to change the Comprehensive Plan’s designation of the two parcels left the parcels without any economic viability, resulting in a taking thereof by the City.[6] The case proceeded to trial in September 2012. Ocean Palm Golfs position was that the City’s denial of its proposed Comprehensive Plan amendment from recreational to low-density residential (a) deprived Ocean Palm Golf of all economically beneficial use of the golf course parcel and, thus, amounted to a total taking, or, at a minimum, (b) resulted in a substantial diminution in the value of the parcel and was therefore a partial taking.
At trial, the parties presented evidence regarding the economic viability of the two parcels. For their part, representatives of Ocean Palm Golf and Caribbean Condo testified that they bought their respective parcels with the plan of developing the condo parcel into a high-density residential complex pursuant to the terms of the Development Agreement and operating the golf course as an amenity thereto. The income from the condominium sales and sales of associate memberships in the golf course would support the golf course operation. Without the development of the condo parcel, the golf course parcel was not a money-maker. In fact, the golf course was never profitable. From its purchase in 1999 until Ocean Palm Golf closed the course in 2008, it never showed a profit. It did have revenue; the revenue was usually in the $100,000 range, but once was as high as $400,000. The expenses were even greater, however, and Cejner never was able to take a salary from the project. Cejner, based on his experience and knowledge of golf course market conditions, believed that a golf course could never be profitably operated on the thirty- *468 four-acre parcel. He testified that beginning in 2007, the golf industry “started to fall apart” all across the country. Furthermore, because the golf course was located just one block from the ocean, salt water in the air and from the soil wreaked havoc on the grass and plants and was very expensive to maintain.
After the golf course was closed in 2008, the company was no longer able to make the mortgage payments, and foreclosure proceedings were commenced. The payoff on the mortgage was $1.6 million at the time of trial. According to Cejner, the condo parcel is not economically feasible on its own “because there’s nothing you could put there. You couldn’t take up that kind of acreage with what we paid and what we’ve lost. There’s no yield off that 2.94 acres anymore.”
Lynch testified that while the City had first seemed to be on board with the project, it appeared to change its stance after public meetings were held at which citizens spoke out against development of the property. Lynch suspected that the City was raising roadblocks to the development in an effort to run the clock out on the Development Agreement.
The parties also presented conflicting expert testimony as to the economic viability of the property. Of major contention was whether the golf course parcel should be considered independent from the condo parcel or whether the two parcels should be considered as a single unit.[7] Ocean Palm Golf urged an independent view of the parcels; the City’s expert analyzed them as a single unit. The experts testified as follows.
Robert Leichtenberg, a real estate appraiser, testified for Ocean Palm Golf. He addressed the two parcels separately because each parcel was owned by a different owner and had different uses. Under the recreational designation, the golf course parcel could be used as a golf course, baseball fields, tennis courts, a lake, hiking trials, or wilderness camping. It was not economically feasible to rehabilitate the golf course because the population of Fla-gler Beach was not large enough to sustain it, and the course competed with several eighteen-hole courses nearby, making it uncompetitive. Most nine-hole courses are owned by municipalities, he explained, because they are not economically feasible. The other uses allowed under the recreational designation would not have been supportable, either. He noted that there are fifteen golf courses within a ten-mile radius of the golf course parcel and that a nine-hole course is not as attractive as an eighteen-hole course. Golf courses are overbuilt and are closing at the rate of one per day. An eighteen-hole course needs a population base of 40,000 people within ten miles to be successful, and the whole population of Flagler County is 97,000 people, who have fourteen courses within range.
Leichtenberg valued the golf course parcel at $170,000 as of October 2, 2008. The low figure was ascribed to the development restrictions and the probability that the City would never re-designate the property. If the golf course parcel had been designated “low density residential” on October 29, 2008, as was up for consideration by the City on that date pursuant to the application to amend the Comprehensive Plan, the value would have been $8,125,000. The parcel could have been divided into 125 lots with a value of $65,000 per lot. The value was high, in part, because there are so few lots left in Florida *469 that are in close proximity to both the ocean and the intracoastal. The diminution in value of the golf course parcel was ninety-eight percent.
For its part, the City called John Robinson, a real estate appraiser, to testify that the golf course parcel had a value of $560,000 as of October 29, 2008, and, he believed, the highest and best use of the land was recreational, i.e., as a golf course, given the current zoning restrictions. He reached his conclusion using comparisons to the sales of properties that were, or at one time had been, golf courses. After reviewing the 2005 tax return, Robinson concluded that the golf course was profitable. He acknowledged, however, that in assessing the value of the golf course parcel, he had not considered whether it was economically feasible to rehabilitate and operate the golf course. He did not conduct before-and-after appraisals of either of the two parcels; thus, he had no opinion as to the difference in value of the golf course parcel operated as a golf course as compared to it having the potential to be developed into single-family residences.
The City also presented expert testimony from Dr. Henry Fishkind, an economist. In evaluating the development potential for the property under the current Comprehensive Plan, over objection, Dr. Fishkind treated the two parcels as one. The court overruled the objection.
Dr. Fishkind testified that, to a degree of economic certainty, even if the City had approved the Comprehensive Plan amendment, there would have been no change in the value of the parcels:
On the one hand, in the before, at least the comprehensive plan would have allowed 54 townhome units and a recreational golf course. And in the — what was denied was the request for 125 single-family lots on those same two pieces of property. And so I analyzed the development of returns from each of those options, using the standard kinds of development approach to value that economists use, that I use in our normal business practice.
Essentially, because there was no lending and no markets in 2008 or '09, the development would have to wait to come to market. And, as a practical matter, it would have to wait anyway. If we look at the golf course townhomes option, it would take time to refurbish the golf course, to replant it, for it to grow in, to be able to get the infrastructure, to build a sales center. All those things take time anyway. Even before that, a site plan would have to have been processed through the City. And those things take 12 to 18 months. So there wasn’t any product that was going to happen anyway until 2010 at the earliest.
I then analyzed the market for the single-family lots, and I used Mr. Leichten-berg’s price of $65,000, although I don’t agree with it, and compared that to what I think a townhouse option would have been for the property, along with the use of the golf course as an operational amenity. My view, recognizing that that operational amenity, like almost any in any project I’ve ever run, runs at a deficit, it’s there to help sell real estate, and I factored that in.
And to a reasonable degree of economic certainty, given the inherent uncertainty in development and sales, we have to use a very large discount rate, Your Honor, so that the streams of value brought to their present value with a discount rate of 80 percent, which is what our clients use, there’s just no distinguishable difference between the proceeds, the net proceeds from the two development options after the discounting and the time involved. So I don’t believe there was *470 any decrement to value based on my analysis.
He subsequently added:
In measuring economic viability, then we don’t take into account the cost basis. The cost basis isn’t irrelevant [sic] to making the decision today. Those costs are sunk. So if the owners can’t make a profit, they can’t make a profit. I’ve given what I think is the land plan that has the highest probability of generating the highest net revenue for them.
He also stated, “[I]t is appropriate to ignore the sunk costs in analyzing economic viability and whether the owners are left with any economically viable use of their property under the current comprehensive plan designations. It ... may not give them a profit, but those are different things.”
Dr. Fishkind also analyzed the development potential of the two parcels as of October 30, 2008, the date on which the proposed amendment to the Comprehensive Plan was rejected. He assumed that the two parcels would be developed “cooperatively” because that was how they had worked in the past — the owners of the two parcels applied jointly for the projects. In his opinion, having a townhouse project that has an adjacent nine-hole golf course is the “most likely and, assumably [sic], viable economic use for the properties” and “could be potentially permitted given the comprehensive plan that encumbers both properties at this time.” His analysis was done assuming that the land would be zoned to allow fifty-four units. He did not believe that sixty percent of the 2.94-acre site would have to be set aside as open space (as it did under current zoning) if both parcels were rezoned. Dr. Fishkind admitted that if the assumption that the two owners would work together was incorrect, then a different analysis would result. He believed, though, that the two owners had an economic interest in working together.
On cross-examination, Dr. Fishkind clarified that his assumptions were that the two parcels were treated as a single entity; the golf course would be rehabilitated and then operated at a loss and turned over to the homeowners. The homeowners would bear the loss into the future, offset by whatever public revenues they received.
Dr. Fishkind was asked to consider a profit analysis. He distinguished net profits going forward from ultimate profits, which takes into account the investment costs. Net profits may not give owners an ultimate profit. Even if there is no ultimate profit, it makes no economic sense to do nothing with the property. Dr. Fish-kind admitted that with the high costs already spent on the two parcels, there was “probably absolutely no development plan that would ever generate positive profit, given the cost and current market conditions and reasonable expectations about a development program and a discounting.”
Following the three-day, nonjury trial, the trial court entered a final judgment in favor of the City. In it, the court rejected Ocean Palm Golfs claim that the City’s refusal to amend the Comprehensive Plan from recreational to low-density residential deprived Ocean Palm Golf of all economically viable use of the property. Noting that the parties had disputed whether the two parcels should be treated as a single tract, the court stated it had considered both alternatives and determined that, under each option, there was an economically beneficial use of the property — it could be operated as a golf course. In considering the parcels together, the court found that Dr. Fishkind’s testimony as to the economically beneficial use was persuasive. In considering the golf course parcel separately, the court found as follows:
*471 In considering the 34-acre golf course standing alone, the Court finds there is an economic beneficial use. [Ocean Palm Golf] contends there is a 10-year history of losses for the property. [Ocean Palm Golf] cites to its 1999 through 2008 tax returns as proof that the property has no economic beneficial use. However, a review of the tax returns indicates the losses, in large measure, are a result of basis costs. The calculation of economic beneficial use is not akin to profitability, as basis costs should not be considered. When factoring out the deductions for interest and depreciation on the tax returns, they reveal there was a profit to [Ocean Palm Golf] in 2001, 2002, 2003, 2004, and 2005. This is so without considering other reasons why [Ocean Palm Golf] was losing money. The Court finds Dr. Fishkind’s opinion as to the economic viability of the golf course to be persuasive.
Ocean Palm Golf timely appealed.
On appeal, Ocean Palm Golf argues that the City’s refusal to amend the Comprehensive Plan in 2008 from recreational to low-density residential to accommodate its proposed development of the golf course parcel constituted a total taking of that property because the current recreational designation of the parcel denied Ocean Palm Golf all economically beneficial use of the property. Ocean Palm Golf further contends that the trial court’s finding that it was not deprived of all economically beneficial use was not supported by competent, substantial evidence. Specifically, Ocean Palm Golf asserts that Dr. Fish-kind’s testimony, upon which the trial court relied, was not competent because it was based on the erroneous assumption that the golf course parcel and the condo parcel could be treated as a single tract. We disagree.
“Inverse condemnation is a cause of action by -a property owner to recover the value of property that has been de facto taken by an agency having the power of eminent domain where no formal exercise of that power has been undertaken.” Osceola Cnty. v. Best Diversified, Inc., 936 So.2d 55, 59-60 (Fla. 5th DCA 2006) (citing Rubano v. Dep’t of Transp., 656 So.2d 1264 (Fla.1995); Sarasota Welfare Home, Inc. v. City of Sarasota, 666 So.2d 171 (Fla. 2d DCA 1995)). To determine whether a government regulation of land use amounts to a taking of property, the court must determine whether the government action deprived the owner of all economically beneficial use of the land. See Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); see also Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) (explaining that a regulation that deprives an owner of all economically beneficial use of property constitutes a per se taking for which the government must pay just compensation); Tampa-Hillsborough Cnty. Expressway Auth. v. A.G.W.S. Corp., 640 So.2d 54, 58 (Fla.1994) (“A taking occurs where regulation denies substantially all economically beneficial or productive use of land.”). Before the takings analysis can be initiated, however, it must first be determined whether the golf course parcel should be considered as a stand-alone parcel or whether it must be considered as a part of a larger tract that includes the condo parcel. See Dist. In-town Props. Ltd. P’ship v. Dist. of Columbia, 198 F.3d 874, 879 (D.C.Cir.1999) (“Under both Lucas and Penn Central, then, we must first define what constitutes the relevant parcel before we can evaluate the regulation’s effect on that parcel.”). Ocean Palm Golf urges the stand-alone view.
*472 Generally, the courts have considered three factors in determining whether parcels are separate and independent or a single tract: “physical contiguity, unity of ownership, and unity of use.” Dep’t of Transp., Div. of Admin. v. Jirik, 498 So.2d 1253, 1255 (Fla.1986) (“Jirik II”). These factors are to be flexibly applied. Id. To determine whether there is unity of use, the courts have assessed the following factors:
(1) intent of the owner, (2) the adaptability of the property, (3) the dependence between parcels, (4) the highest and best use of the property, (5) zoning, (6) the appearance of the land, (7) the actual use of the land, and (8) the possibility of tracts being combined in use in the reasonably near future.
Town of Jupiter v. Alexander, 747 So.2d 395, 400 (Fla. 4th DCA 1998) (citing Div. of Admin. v. Jirik, 471 So.2d 549, 554-55 (Fla. 3d DCA 1985) {“Jirik I ”)).
It is undisputed that the golf course parcel and the condo parcel are two legally distinct lots. Because the property is separately platted and unoccupied, there is a rebuttable presumption of separateness. Jink II, 498 So.2d at 1256-57. We believe that the City did, in fact, rebut that presumption. In our view, the unity of use factor weighs in favor of finding that the presumption was rebutted. Historically, the two parcels were a single tract of land, until 1989, at which point the Development Agreement treated them as two distinct tracts. While the two parcels were sold to different owners in 1999, the purchasers worked together to obtain approval of symbiotic developments on the parcels. And, significantly, Ocean Palm Golf and Caribbean Condo treated the two parcels as one in their application for the Comprehensive Plan amendment.
The unity of ownership factor also weighs in favor of finding that the City rebutted the presumption of separateness. Although the parcels are now owned by different companies, there is substantial overlap in principals and shareholders of those companies. For instance, Stephen Cejner is the principal of both Ocean Palm Golf and Caribbean Condo. Moreover, in the amendment application, the parcels were claimed to be owned by Ocean Palm Golf alone. Ocean Palm Golf made a similar representation in a prior lawsuit.
Lastly, the physical contiguity factor weighs in favor of finding that the City rebutted the presumption of separateness. The two parcels at issue here are uniquely situated — not only are they contiguous, but one is located within the other.
Given our conclusion that the presumption of separateness was rebutted by the City, we hold that Dr. Fishkind’s testimony — that, taken together, the parcels retained an economically beneficial use— constituted competent, substantial evidence upon which the trial court properly relied. Because Ocean Palm Golf was not deprived of all economically beneficial use of the parcels, we affirm the trial court’s ruling that a total taking did not occur here.
We agree with Ocean Palm Golf that the government’s refusal to act can constitute a total taking under some circumstances. See, e.g., Tollius v. City of Miami, 96 So.2d 122 (Fla.1957) (holding that the denial of property owner’s request to rezone lots from residential to commercial was an abuse of discretion because the character of the area had changed greatly, rendering single-family residential use unsuitable); Kugel v. City of Miami, 206 So.2d 282 (Fla. 3d DCA 1968) (concluding that denial of rezoning request from residential to less restrictive zone constituted a taking of the property where what had been quiet residential area was now sur *473 rounded by tall buildings and parking lots). However, as the City correctly points out, the cases holding that a taking has occurred when the government refuses a request to change zoning, even though the character of the land surrounding the affected land has changed dramatically, are distinguishable from this case because, here, the character of the property surrounding the golf course parcel has remained largely the same for decades — it has long been used for single- and multifamily residences. Ocean Palm Golf replies that the changed circumstance on which it is relying is not a change to the surrounding properties, but rather is the change in market and demographic factors: the fact that golf courses across the country are no longer profitable due to the over-construction of golf courses, the aging golf population, and the increased expense involved in operating the golf course. We deem this to be a faulty argument, as it is based on Ocean Palm Golfs failed economic expectations. In effect, Ocean Palm Golfs position is that if a landowner buys a piece of property and the economy later takes a downturn, resulting in the frustration of the landowner’s expectations, then the government must act as a guarantor for the landowner’s investment after it becomes unprofitable due to, not the zoning regulations, but outside market forces. This is not the purpose of eminent domain law.
Although the partial takings claim was not addressed in the final order and judgment, both parties have assumed that the trial court implicitly denied Ocean Palm Golfs partial taking claim.[8] Viewing the trial court’s order as a rejection of the partial takings claim, we review the facts in that light. We conclude that no partial taking occurred here. “In an as-applied claim, the landowner challenges the regulation in the context of a concrete controversy specifically regarding the impact of the regulation on a particular parcel of property.” Collins v. Monroe Cnty., 999 So.2d 709, 713 (Fla. 3d DCA 2008). The standard for evaluating as-applied claims originates from the Supreme Court’s decision in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). “In Penn Central, the Court identified three factors to apply when engaging in an analysis of whether a regulation constitutes a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed- expectations; and (3) the character of the governmental action.” Leon Cnty. v. Gluesenkamp, 873 So.2d 460, 467 (Fla. 1st DCA 2004).
Ocean Palm Golf admits that the second Penn Central factor weighs in favor of finding that no partial taking occurred because the City’s refusal to amend the Comprehensive Plan did not interfere with its reasonable investment-backed expectations, as it purchased the golf course parcel well aware that it wás zoned recreational and it intended to put the property to recreational use as a golf course. However, Ocean Palm Golf argues that the other two Penn Central factors weigh in favor of finding a partial taking.
We agree with Ocean Palm Golf that the third Penn Central factor, the character of the government action, weighs in favor of finding a partial taking because the burden of the regulation falls disproportionately on Ocean Palm Golf. In a separate but related case involving the same parties, a *474 prior trial court found that “[t]his parcel constitutes a substantial portion of the green space for the City” and that “it is the only privately owned parcel with an ‘R’ [recreational] designation.” Thus, while the benefits of the open space provided by the golf course are widely shared throughout the Flagler Beach community, Ocean Palm Golf alone shoulders the burden of that regulation.[9] Cf. Wensmann Realty, Inc. v. City of Eagan, 734 N.W.2d 623, 640 (Minn.2007) (finding that “character of the government action” factor weighed in favor of property owner where the “Parks, Open Space and Recreation” land use designation “seems aimed at things that have been considered governmental functions” and where “[t]he benefits of the open space provided by the golf course are widely shared throughout the community, but the costs are focused solely on the property owner”). However, the first Penn Central factor — the economic impact of the regulation — weighs in favor of finding that there has been no partial taking. Dr. Fishkind’s testimony demonstrated that the two parcels, taken together, retained an economically beneficial use. Cf. Fla. Rock Indus. Inc. v. United States, 18 F.3d 1560, 1568 (Fed.Cir.1994) (noting that a partial regulatory taking may be found where a regulation results in the deprivation of “a substantial part ... of the economic use or value of the property”). Balancing these three Penn Central factors, we conclude that there was no partial taking here. Accordingly, we affirm the trial court’s judgment in all respects.
AFFIRMED.
LAWSON and BERGER, JJ., concur.

. Caribbean Condo voluntarily dismissed its separate appeal.

. The parcels are surrounded by multi-family and single-family residences.

. As Cejner later explained, the investors decided that "we'll buy an acre from ourselves."

. At this point, the condo parcel was subject to a thirty-five-foot height limit that had been adopted by the City in 2006.

. Ocean Palm Golf and Caribbean Condo brought other causes of action in addition to their takings claims. Those causes of action are not relevant to this appeal, however.

. This is important because, before a takings analysis can be undertaken, the subject of the alleged taking must first be determined.

. Ordinarily, the failure to obtain a ruling on this claim would be fatal to Ocean Palm Golf's appeal of this issue; however, during oral argument, the City stipulated that the trial court implicitly denied Ocean Palm Golf's partial takings claim. With some reservation, we accept that stipulation for purposes of appeal.

. Our conclusion is buttressed by the outpouring of public opposition to development of this project as well as the comment made by a city commissioner.