# Supreme Court of Florida

_____

No. SC16-1107
_____

**TREASURE COAST MARINA, LC, etc., et al.,**
Petitioners,

vs.

**THE CITY OF FORT PIERCE, FLORIDA, etc., et al.,**
Respondents.

[June 15, 2017]

LEWIS, J.

This case is before the Court for review of the question certified in the decision of the Fourth District Court of Appeal in City of Fort Pierce v. Treasure Coast Marina, LC, 195 So. 3d 1141 (Fla. 4th DCA 2016). Our review involves consideration of the exemption from ad valorem taxation contained in article VII, section 3(a), of the Florida Constitution that applies to property owned and used exclusively by municipalities for municipal or public purposes. Specifically, in Treasure Coast Marina, the district court ruled upon the following question, which the court certified to be of great public importance:

> IN LIGHT OF FLORIDA DEPARTMENT OF REVENUE V. CITY OF GAINESVILLE, 918 So. 2d 250 (Fla. 2005), DOES A

MUNICIPALLY OWNED AND OPERATED MARINA STILL QUALIFY AS A TRADITIONALLY EXEMPT "MUNICIPAL OR PUBLIC PURPOSE" UNDER ARTICLE VII, SECTION 3(a) OF THE FLORIDA CONSTITUTION?

Id. at 1147. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. We answer this question in the affirmative and approve the decision below.

## FACTUAL BACKGROUND

This case commenced on October 28, 2011, when the owners of a private marina filed a complaint challenging the tax-exempt status of the Fort Pierce City Marina and the Fisherman's Wharf Marina. Because the marinas were respectively owned by the City of Fort Pierce and the Fort Pierce Redevelopment Agency, the complaint was filed against those entities (collectively "the City"); the St. Lucie County Tax Appraiser (the Property Appraiser); and the Executive Director of the Florida Department of Revenue (the Department of Revenue). The plaintiffs who filed the complaint, Treasure Coast Marina, LC; Raincross Holdings, LC; and Riverfront Developers, LC (collectively "Riverfront"); own and operate a private marina in Fort Pierce which is subject to ad valorem taxation. Of relevance here, Riverfront's amended complaint seeks declaratory and injunctive relief on the basis that the Property Appraiser unconstitutionally granted ad valorem tax exemptions during tax years 2011, 2012, and 2013 to the two marina properties owned and operated by the City.

- 2 -

Following discovery, cross-motions for final summary judgment were filed and the parties conceded that there were no genuine issues of material fact. The trial court ruled in favor of Riverfront, concluding that neither of the City marinas qualified for the constitutional tax exemption. To reach this conclusion, the trial court determined that both City marina properties at issue were not used for a "municipal or public purpose," and therefore, in its view the Property Appraiser unconstitutionally granted the exemptions at issue. The trial court applied an exceedingly narrow standard because it believed that we announced a new legal standard and discarded years of precedent when we issued our decision in Gainesville, 918 So. 2d 250.

The City and Property Appraiser jointly appealed to the Fourth District Court of Appeal. On appeal, the Fourth District reversed. Treasure Coast Marina, 195 So. 3d at 1147. The Fourth District reasoned that this Court in Gainesville "did not change the legal standard for municipal purpose under article VII, section 3(a) of the Florida Constitution, and that it used the same definition of municipal or public purpose as in prior court opinions. Under this definition, municipal marinas are traditionally considered exempt from taxation." Id. at 1142-43. The district court further reasoned that:

> [t]he marinas are open to public use, are exclusively owned and
> operated by the City, and provide recreation for local residents and
> support the local economy by attracting non-local residents. . . . Thus,
> not only do the City's marinas serve a purpose that has been

- 3 -

repeatedly and explicitly recognized as a "municipal or public purpose," they also operate specifically "for the comfort, convenience, safety, and happiness of the municipality's citizens[,]" and serve the public purpose of developing recreational facilities in "increas[ing] trade by attracting tourists and [providing] recreation for the citizens."

Id. at 1146-47 (internal citations omitted). Noting the large boating community in Florida and the economic impact of tax exemptions for municipal marinas, the district court certified the question to this Court. Id. at 1147. This review follows.

## ANALYSIS

We embark on our voyage by looking to the underlying constitutional provisions at issue, and because this case involves questions of constitutional law, our review is de novo. See Lewis v. Leon Cty., 73 So. 3d 151, 153 (Fla. 2011). The first provision of note is contained in article VII, section 4, of the Florida Constitution, and it specifically requires that real property be subject to ad valorem taxation with certain exceptions that do not apply here:

By general law regulations shall be prescribed which shall secure a just valuation of all property for ad valorem taxation . . . .

Art. VII, § 4, Fla. Const. However, our Constitution also recognizes that certain properties owned and used exclusively by municipalities are constitutionally exempt from ad valorem taxation, pursuant to article VII, section 3(a), which provides in pertinent part:

- 4 -

All property owned by a municipality and used exclusively by it for municipal or public purposes shall be exempt from taxation.

Art. VII, § 3(a), Fla. Const.

Seeking to eject the City's marinas from the safe harbor provided by that constitutional language, Riverfront attempts to transform the ripples from our decision in Gainesville into a landscape-altering tempest. Specifically, in challenging the exemptions historically applied to the City Marina and the Fisherman's Wharf Marina, Riverfront contends that in Gainesville we announced an entirely new, more restrictive standard for the application of the constitutional exemption. While Riverfront acknowledges that the definition of "municipal or public purpose" has not changed, it asserts that the Gainesville majority opinion changed application of the test by focusing on the word "essential." According to Riverfront, our focus on the word "essential" in Gainesville was new and represents a different and more narrow application of the tax exemption than is reflected in prior cases, which Riverfront considers to be an indication that prior precedent is no longer relevant.

Although Riverfront's misplaced reliance on Gainesville is understandable given the nature of the facts, our discussion in Gainesville, and the fact that Gainesville emanated from this Court—our state's highest court—Riverfront loses its bearings by extrapolating Gainesville beyond its narrow confines onto areas of law that have been well-settled for years. In reality, our decision in Gainesville

- 5 -

was no more than a passing wave in the vast ocean of ad valorem taxation precedent.

As evidence of this truth, in Gainesville we explicitly noted the distinct circumstances we were reviewing. First, in Gainesville we did not have before us an as-applied challenge to the issuance of an exemption, but rather a facial challenge to a statute imposing ad valorem taxes on a municipality. 918 So. 2d at 253. Thus, our review was limited to determining whether there were any circumstances under which the statute could be upheld. Id. at 256, 265. The statute in question authorized municipalities to provide telecommunications services for the first time but conditioned that authorization on a municipality paying ad valorem taxes on the relevant properties. See id. at 253-54. Prior to the statute authorizing municipalities to provide telecommunications services for the first time ever, the Public Service Commission was not authorized to issue such permits to a municipality. See id. Therefore, we recognized a second distinction by explicitly noting in Gainesville that we were analyzing the exemption in the context of a service that has historically been provided by the private sector rather than any traditional municipal function. Id. at 265. This critical distinction between telecommunication services and traditional municipal functions, such as electric services, housing, and parks, signals both that Gainesville applies to a

limited circumstance and that the cases addressing those traditional municipal functions remain good law.

In fact, contrary to Riverfront's understanding, our discussion in Gainesville actually further supports the continued vitality of the traditional municipal function course plotted by our precedent. For instance, as Riverfront acknowledges, in Gainesville we recognized that although the constitutional tax exemption provision was revised from its counterpart contained in the 1885 Constitution to curb perceived abuses in favor of private operators seeking a profit, that end was not advanced by changing the definition of "municipal or public purposes," but rather by requiring ownership and use by the municipality. Id. at 261 ("Thus, although the framers of article VII, section 3(a) sought to limit the holding in Daytona Beach Racing[ & Recreational Facilities District v. Paul, 179 So. 2d 349 (Fla. 1965)], they did so by requiring both ownership and exclusive use of the property by the municipality rather than by narrowing the definition of municipal purposes." (emphasis added)). Further, we reaffirmed at length that the phrase "municipal or public purposes" remains equal to that under prior precedent construing the terms, both under the 1885 Constitution and the 1968 Constitution:

> In the absence of any indication in the Constitution to the contrary, we conclude that the term "municipal or public purposes" should be construed in accordance with the definition utilized by the Court in its prior decisions on the constitutional tax exemption. There is nothing in the language of article VII, section 3(a) that evinces an intent to create a more restrictive definition of "municipal or public purposes"

for property that is owned and used exclusively by the municipality than the definition applied to "municipal purposes" under the 1885 Constitution in McDavid[1] and Saunders[2] through the 1968 adoption of the current provision.  Although McDavid and Saunders rested at least in part on judicial deference to the Legislature's assessment of what type of activity served municipal purposes, we have no basis to conclude that a narrower construction was intended when the self-executing exemption was included in the 1968 Constitution.  To the contrary, had the framers of article VII, section 3(a) intended to narrow the exemption, they could have specifically defined "municipal or public purposes," or used different terms altogether.

. . .  As stated by one observer shortly after the adoption of the 1968 Constitution, cases construing the constitutional municipal purposes exemption and the statutory public purposes exemption "continue to be good law even after the adoption of the new constitution."  Robert F. Williams, Note, Property Tax Exemptions Under Article VII, Section 3(a) of the Florida Constitution of 1968, 21 U. Fla. L. Rev. 641, 643 (1969).

We therefore conclude that the "municipal or public purposes" for which municipally owned property must be exclusively used in article VII, section 3(a) to qualify for an ad valorem tax exemption encompass activities that are essential to the health, morals, safety, and general welfare of the people within the municipality.

Id. at 263-64 (emphasis added).  Thus, as all parties here agree, "municipal or public purposes" in the constitutional tax exemption context—both before and after Gainesville—"encompass activities that are essential to the health, morals, safety, and general welfare of the people within the municipality."  Id. at 264.

---

1.  State ex rel. Harper v. McDavid, 200 So. 100 (Fla. 1941).

2.  Saunders v. City of Jacksonville, 25 So. 2d 648 (Fla. 1946).

In performing a facial constitutionality analysis in Gainesville and applying that definition of "municipal or public purposes," we focused on the word "essential," noting that the term involves the concept of great need or necessity:

> In putting this definition into practice, we focus on the word "essential," which is generally defined as something basic, necessary, or indispensable. See Merriam-Webster's Collegiate Dictionary 396 (10th ed. 1999). For example, an "essential element" is one on which proof is required in order to establish a legal claim or criminal offense. See, e.g., Rubano v. Dep't of Transp., 656 So. 2d 1264, 1266 (Fla. 1995) ("Proof that the governmental body has effected a taking of the property is an essential element of an inverse condemnation action."); Randall v. State, 760 So. 2d 892, 901 (Fla. 2000) ("[P]remeditation is the essential element that distinguishes first-degree murder from second-degree murder."). Thus, inherent in the word essential is the concept of great need or necessity.

Id. Riverfront seizes on this singular passage and our recognition of certain distinctions of prior precedent to conclude that we narrowed the legal standard for municipal or public purpose tax exemptions, suggesting that the standard requires indispensability and a lack of private sector competition.

However, the very next two paragraphs in Gainesville indicate that Riverfront reads too much into that language. Instead of discarding our prior precedent, we embraced it and noted that "a thread of necessity also runs through the precedent concerning tax exemptions for municipal use of municipally owned property that we have discussed." Id.

Accordingly, in Gainesville, we specifically distinguished telecommunication services from "electrical power and public parks" because

- 9 -

"telecommunication services have historically been provided by the private sector." Id. at 265. Further reflecting this distinction, we noted that "[t]he presumption underlying [City of Sarasota v. Mikos, 374 So. 2d 458 (Fla. 1979)], that vacant land owned by a municipality is held for a public purpose, would be inappropriate for municipally owned property used by the municipality to engage in a business venture to provide services in competition with the private sector." Id. at 261 n.12. Ultimately, in the next paragraphs we explained why traditional municipal functions, such as providing public housing, electricity, and parks are presumed to satisfy the "essential" component of a "municipal or public purpose":

> In McDavid, which held a tax exemption for a public housing facility valid, the Legislature had declared that housing conditions were "a menace to the health, safety, and morals of the people . . . necessitat[ing] excessive expenditures for crime and fire prevention, health, and welfare," and that public safety "demand[ed]" replacement of slums by "sanitary and better housing facilities." In upholding the tax exemption for property owned by a municipal power company located in another county in Saunders, we recognized that the Legislature "was doubtless well aware of the need for light, heat and power by those areas outside of municipalities." Similarly, in Ford,[3] this Court held that the production of electricity by a municipality's power company served a municipal purpose. Such services are essential in that municipally owned power companies have legally protected monopolies within their territorial boundaries, and have traditionally provided these services. Finally, the tax-exempt status upheld in Mikos for vacant land held by a municipality to preserve

---

3. Ford v. Orlando Utilities Comm'n, 629 So. 2d 845 (Fla. 1994) (holding tax-exempt under article VII, section (3)(a), Florida Constitution, a municipally owned electric generating plant, but located in adjacent county and not serving residents of the adjacent county).

> natural open spaces or for future needs is consistent with the traditional municipal function of providing parks for the municipal population.  Cf. City of Miami Beach v. Hogan, 63 So. 2d 493, 495 (Fla. 1953) (stating that "[i]n all heavily populated municipalities the police power should be exercised by municipal officials to afford all of the people light, air, [and] an opportunity for recreation").

Id. at 264-65 (some internal citations omitted).  Therefore, in Gainesville we did not announce a new standard, but rather simply recognized a critical distinction between traditional municipal functions and functions historically provided by the private sector for purposes of the "municipal or public purposes" constitutional tax exemption.

Our district courts have had no trouble recognizing this critical distinction. In Zingale v. Crossings at Fleming Island Community Development District, the First District correctly rejected the contention that Gainesville altered—let alone narrowed—the test for a "municipal or public purpose."  Zingale, 960 So. 2d 20, 24-25 (Fla. 1st DCA 2007), decision quashed sub nom. Crossings at Fleming Island Cmty. Dev. Dist. v. Echeverri, 991 So. 2d 793 (Fla. 2008).[4]  At the time, the district court recognized that our decision in Gainesville had noted that municipalities traditionally provide parks and opportunity for recreation, but also

_____

4. Although we reviewed and quashed Zingale on the question of standing of one of the parties to raise a particular defense, there was standing with regard to the issue of application of the tax exemption.  We did not address or disturb the correct analysis in that case.  See generally Echeverri, 991 So. 2d 793.

- 11 -

that telecommunication services have been historically provided by the private sector. Id. at 25. Thus, the Zingale court affirmed the application of the constitutional exemption to a "golf course, swimming pools, tennis courts, and playgrounds." Id. at 24-25. Likewise, even the two decisions upon which Riverfront relies do not support its argument. The same year Zingale was decided, the First District once again correctly recognized the distinction in City of Gainesville v. Crapo, noting that this Court made clear in Gainesville that telecommunication services are distinct in that they have traditionally been provided by the private sector. City of Gainesville v. Crapo, 953 So. 2d 557, 563 (Fla. 1st DCA 2007). Similarly, in CAPFA Capital Corp. 2000A v. Donegan, the Fifth District recognized that in Gainesville we "suggested that certain categories of services which have been traditionally provided by municipalities, such as public housing and utilities, are within the concept [of municipal and public purposes] and thus remain exempt from taxation." CAPFA, 929 So. 2d 569, 572 (Fla. 5th DCA 2006). Correctly applying the law, the CAPFA court then held that a student housing investment project located in an adjacent county was not tax exempt, specifically noting: "Nor are student housing projects at market prices a traditional service historically provided by municipalities. Such services have

typically been provided by the private sector, or the educational institutions themselves."[5] Id. at 574.

Therefore, our inquiry turns to whether public marinas are traditional municipal functions that are presumed to be tax exempt under article VII, section (3)(a). While we have not previously addressed application of this exemption specifically to municipally owned marinas, as the decision below recognized, other district courts have opined on the subject. In Page v. City of Fernandina Beach, the First District considered the tax-exempt status of a marina owned by the City of Fernandina Beach, but operated by a private lessee for private gain. Page, 714 So. 2d 1070, 1077 (Fla. 1st DCA 1998). Due to the lease to a private operator, the First District held that the marina was not entitled to a tax exemption.[6] Id. However, relevant here, the district court opined in dicta that a marina both owned and operated by the municipality would be constitutionally exempt:

_____

5. As a result, we are concerned by the errant dicta language in CAPFA referring to "the more stringent definition of municipal or public purposes espoused by the [Gainesville] case." CAPFA, 929 So. 2d at 573. We expressly disapprove that language, but recognize that ultimately the CAPFA court correctly applied the law and aptly noted the distinction between traditional municipal functions and those functions historically provided by the private sector.

6. Tax exemptions for private leasehold interests in municipally owned property are subject to a stricter test known as the "governmental-governmental" standard. See generally Sebring Airport Auth. v. McIntyre, 783 So. 2d 238 (Fla. 2001).

- 13 -

> Municipal operation of a marina is a legitimate municipal corporate undertaking for the comfort, convenience, safety, and happiness of the municipality's citizens. Indeed, the uncontradicted expert testimony was that operation of this marina constituted a proper municipal or public function. <u>When a city operates a marina it owns, marina property it has not leased to a nongovernmental entity is exempt from ad valorem taxation.</u>

<u>Id.</u> at 1076-77 (emphasis added).

Although that portion of <u>Page</u> was dicta, in <u>Islamorada, Village of Islands v. Higgs</u>, the Third District, sitting en banc, expressly approved that reasoning and held that a marina owned and operated by a municipality was exempt. <u>Islamorada</u>, 882 So. 2d 1009, 1011 (Fla. 3d DCA 2003). In <u>Islamorada</u>, the marina generated revenues that exceeded the marina's expenses, its customers were both residents and the general public, including out-of-town visitors, and the marina was contained within a recreational facility. <u>Id.</u> at 1010-11. The <u>Islamorada</u> court's analysis turned on whether the municipality used the marina for municipal or public purposes. <u>Id.</u> at 1011. In so analyzing, the district court noted that "the term 'municipal purpose' embraces all activities essential to the health, morals, protection and welfare of the municipality." <u>Id.</u> (citing <u>Greater Orlando Aviation Auth. v. Crotty</u>, 775 So. 2d 978, 980 (Fla. 5th DCA 2000)). It further noted that "municipal functions" are functions which "specifically and peculiarly promote the comfort, convenience, safety and happiness of the citizens of the municipality rather than the welfare of the general public." <u>Id.</u> (citing <u>Crotty</u>, 775 So. 2d at 980-

- 14 -

81).  Islamorada also expressly agreed with the First District's dicta in Page, emphasizing the language, "When a city operates a marina it owns, marina property it has not leased to a nongovernmental entity is exempt from ad valorem taxation."  Id. (citing Page, 714 So. 2d at 1076).  The Third District concluded Islamorada by noting that the marina fulfills a public purpose, "despite the fact that the Village earns a profit from its operation of the Marina."  Id.  We agree and approve the analysis in Islamorada.

Indeed, we have little difficulty in concluding that marinas undoubtedly fall in the same category of traditionally-exempt property occupied by public housing projects, electrical infrastructure, and parks.  We perceive at least three different ways in which a nexus is formed between marinas and "municipal or public purposes."

First, one need not have special training to realize that marinas provide an invaluable contribution to serving the transportation needs of coastal communities dating to the birth of this nation and our state.  Prior to January 22, 1912, when the Florida East Coast Railway's Over-Sea Railroad to Key West was completed, the Florida Straits were only accessible by sea.[7]  Reflecting on the importance of

---

7.  Linking the Keys, Library of Cong., https://www.loc.gov/item/today-in-history/january-22 (last visited June 5, 2017).

marinas and ports, at the time, nearly twenty thousand people lived in Key West.[8]

Likewise, the record in this case discloses that the City Marina, although formally established in 1938, traces its roots to various iterations of a town dock on the same site dating back to the early 1900s. Further, Florida's 1,197 statute miles of coast line,[9] significant contribution to the Intracoastal Waterway, and peninsular shape quickly impress the historic importance of marine transportation in Florida upon even the casual observer.

Second, public marinas also serve municipal or public purposes by ensuring access to the waterfront, which grows more essential by the day as a result of private development. Municipalities across the state have struggled in recent years to protect both a view of and access to the water to the citizenry from the profit-oriented grips of developers seeking to privatize the waterfront through the construction of towering condominium and apartment buildings that block the

---

8. Linking the Keys, Library of Cong., https://www.loc.gov/item/today-in-history/january-22 (last visited June 5, 2017). See generally Florida East Coast Railway, The Story of a Pioneer: A Brief History of the Florida East Coast Railway and Its Part in the Remarkable Development of the Florida East Coast 30 (1946).

9. Quick Facts, Florida Dep't of State, http://dos.myflorida.com/florida-facts/quick-facts/ (last visited June 5, 2017).

waterfront from those who do not have the means or simply do not want to live in a condominium.[10]

Third, marinas also serve to advance the recreational needs of a municipality's citizens. Landlocked citizens may break free from the confines of their yards or apartment complexes and enjoy the magnificent Florida waters through public marinas. Moreover, the fact that not everyone enjoys boating by virtue of the varied and wide-ranging interests that render us human has no bearing on our analysis. Florida courts have repeatedly recognized that similar taste-based recreational activities, such as golf and tennis, are sufficiently essential recreational activities that support application of the constitutional exemption. See, e.g., Zingale, 960 So. 2d at 24-26; Sun 'N Lake of Sebring Imp. Dist. v. McIntyre, 800 So. 2d 715, 723 (Fla. 2d DCA 2001) ("It is possible that a golf course or tennis courts, owned by a municipality and held open to the public, and not operated in conjunction with a for-profit business, may serve an exclusively public purpose.").

---

10. See, e.g., Nicholas Nehamas, As Waterfront Land Dries Up, Developers Rush to Miami River, Miami Herald (June 7, 2015), http://www.miamiherald.com/news/business/biz-monday/article23356026.html; Harry Emilio Gottlieb, Letter to the Editor, Condos Eat Up Miami's Waterfront Property, Miami Herald (June 23, 2016), http://www.miamiherald.com/opinion/letters-to-the-editor/article85671387.html.

Furthermore, as the City contends, the Legislature has expressly recognized the importance of the waterfront and the role of public marinas in furthering those interests:

> 342.07   Recreational and commercial working waterfronts; legislative findings; definitions.—
>
> (1)   The Legislature recognizes that there is an important state interest in facilitating boating and other recreational access to the state's navigable waters.  This access is vital to tourists and recreational users and the marine industry in the state, to maintaining or enhancing the $57 billion economic impact of tourism and the $14 billion economic impact of boating in the state annually, and to ensuring continued access to all residents and visitors to the navigable waters of the state.  The Legislature recognizes that there is an important state interest in maintaining viable water-dependent support facilities, such as public lodging establishments and boat hauling and repairing and commercial fishing facilities, and in maintaining the availability of public access to the navigable waters of the state.  The Legislature further recognizes that the waterways of the state are important for engaging in commerce and the transportation of goods and people upon such waterways and that such commerce and transportation is not feasible unless there is access to and from the navigable waters of the state through recreational and commercial working waterfronts.

§ 342.07, Fla. Stat. (2016).[11]  Moreover, the importance of public marinas and their nexus to providing transportation and commerce was enshrined in the Florida

---

11.  Public marinas are expressly contemplated within the definition of "recreational and commercial waterfront."  § 342.201(2)(b), Fla. Stat. (2016) ("The term includes water-dependent facilities that are open to the public and offer public access by vessels to the waters of the state. . . .  These facilities include . . . wet and dry marinas . . . .").

Constitution when the voters passed the "Assessment of Working Waterfront

Property Based Upon Current Use" amendment in 2008, which is contained in

article VII, section 4(j), of the Florida Constitution and provides in pertinent part:

> (j)(1)   The assessment of the following working waterfront
> properties shall be based upon the current use of the property:
>
> a.   Land used predominantly for commercial fishing purposes.
> b.   Land that is accessible to the public and used for vessel launches
> into waters that are navigable.
> c.   <u>Marinas and drystacks that are open to the public.</u>
> d.   Water-dependent marine manufacturing facilities, commercial
> fishing facilities, and marine vessel construction and repair facilities
> and their support activities.

Art. VII, § 4(j)(1), Fla. Const. (2008) (emphasis added); Amends. Proposed by

Tax'n & Budget Reform Comm'n, Revision Nos. 3, 4, and 6, 2008, filed with the

Secretary of State April 28, 2008; adopted 2008.[12]

Therefore, because public marinas have been considered traditional

municipal functions and our decision in <u>Gainesville</u> did not announce any new

---

12.   We note that this amendment concerning the assessed taxable value of such property does not in any way intrude on the applicability of the constitutional exemption.  For instance, there are publicly owned marinas that are leased to private operators that would not qualify for the exemption.  <u>See, e.g.</u>, <u>Page</u>, 714 So. 2d 1070.  The amendment merely protects against assessment of the highest and best use of the waterfront property on which a marina would sit, which might, for instance, be assessed at a higher tax rate if the property could support construction of a sophisticated office tower.

standard, we answer the certified question in the affirmative and expressly approve the decision below.

Having untangled the constitutional question, we now turn to the record in this case and the trial court's entry of summary judgment in favor of Riverfront.[13] In declaring the tax exemptions at issue here unconstitutional, the trial court essentially ruled that Riverfront had rebutted the presumption of tax-exempt status for properties owned and used exclusively by a municipality for municipal or public purposes that attaches where the property involves a traditional municipal function, such as a public marina. We disagree with that understanding.

Nothing in the record indicates that the marinas in this case do not serve a municipal or public purpose. Riverfront contends that the placement of a lock on some of the docks destroys the public nature of these marinas.[14] However, the protection of boats and other property from vandalism and crime is entirely consistent with the operation of a marina, and the record indicates that the locks here were put in place to address security concerns. Moreover, the fact remains that the marinas in this case are open to the public and any member of the public

---

13. Our review of orders entering summary judgment is also de novo. Volusia Cty. v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla. 2000).

14. Three of the eight docks at the City Marina are usually locked. The only dock at the Fisherman's Wharf Marina is usually locked. The record indicates that these locks were put in place by the City due to security concerns.

may go to the office at either marina, as would a patron at any public golf club or tennis club with an office. Furthermore, while most of the slips may be leased to individuals, the record here indicates that the marinas do not charge any fee for boaters who wish to dock just for the day. Similarly unavailing, the fact that more nonresidents than residents of the municipality might use the marina is also entirely consistent with the objectives of a municipal marina to operate as a component of the transportation infrastructure and bring economic activity into the municipality.

Further, depriving the City of its constitutional right to the exemptions at issue here on the basis that marinas may also be run by the private sector or compete with the private sector would sink the exemption in nearly every context because almost any function today may be equally provided by the private sector. Cf. Saunders, 25 So. 2d at 650 ("We are not justified in declaring the act invalid because it might enable the City to compete with private utilities required to pay taxes.").[15] Such an analysis ignores the fact that publicly owned and operated

---

15. In Saunders, this Court noted that the Legislature was a safeguard against abuses that might allow municipalities to "take business from competing tax paying utilities." Id. ("Our answer, if any is needed, is that the legislature is the arbiter of this question and its judgment under Article 8, Section 8, Constitution, is final unless an abuse of power is shown."). While the constitutional provision at issue in Saunders was replaced with article VII, section 3(a), which is now self-executing, we note that the concern of cities abusing tax-exempt status to take business away from competing private entities is likewise tamed by the

facilities are open to the public, as opposed to private facilities which generally may freely pick and choose among those clients they wish to serve, or be far more motivated by pecuniary interests. In any event, here the Property Appraiser has correctly created separate tax folios for the portions of the marina properties that are leased to private operators and the City pays ad valorem taxes on those portions.[16]

Therefore, Riverfront has not carried its burden to rebut the presumption that the municipally owned properties here that are used exclusively by the municipality to provide traditional municipal functions are constitutionally exempt from ad valorem taxation. Accordingly, we conclude that the district court correctly reversed the trial court for erroneously disturbing the tax-exempt status of the City's marinas.

## CONCLUSION

For the reasons expressed above, we reaffirm that our decision in Gainesville did not announce a new standard for applying the municipal or public purposes tax exemption contained in article VII, section 3(a), of the Florida

---

requirement in article VII, section (3)(a), that the municipality simultaneously own and exclusively use the tax exempt property.

16. For this reason, the "exclusive use" requirement of the constitutional exemption is not at issue on this record.

Constitution. We also hold that for purposes of applying that constitutional tax exemption, a public marina owned and operated by a municipality is a traditional municipal function that carries a presumption of tax-exempt status. Accordingly, we answer the certified question in the affirmative, approve the decision below, and direct upon remand that the trial court enter a final summary judgment in favor of the Respondents recognizing that the public marinas at issue here are properly tax-exempt for the tax years at issue.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, CANADY, POLSTON, and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal – Certified Great Public Importance

Fourth District - Case No. 4D14-3064

(St. Lucie County)

Brigid F. Cech Samole of Greenberg Traurig, P.A., Miami, Florida; and Jerry Stouck of Greenberg Traurig, LLP, Washington, District of Columbia,

for Petitioners

Robert V. Schwerer and James T. Walker of Hayskar, Walker, Schwerer, Dundas & McCain, P.A., Fort Pierce, Florida,

for Respondents City of Fort Pierce and Fort Pierce Redevelopment Agency

Loren E. Levy and Jon F. Morris of The Levy Law Firm, Tallahassee, Florida,

for Respondent Ken Pruitt, St. Lucie County Property Appraiser

Harry Morrison, Jr., and Kraig Conn of Florida League of Cities, Tallahassee, Florida; and Benjamin K. Phipps of Phipps & Howell, Tallahassee, Florida,

for Amicus Curiae Florida League of Cities