# Supreme Court of Florida

————————

No. SC2022-0741

————————

**CITY OF GULF BREEZE, etc.,**
Petitioner,

vs.

**GREGORY S. BROWN, etc., et al.,**
Respondents.

November 27, 2024

PER CURIAM.

The City of Gulf Breeze owned and operated a public golf course that, for several years, the Santa Rosa County Property Appraiser determined was exempt from ad valorem taxation under article VII, section 3(a) of the Florida Constitution. That constitutional provision provides in relevant part: "All property owned by a municipality and used exclusively by it for municipal or public purposes shall be exempt from taxation." But the Appraiser began denying the exemption after the City, which sought to operate the golf course more efficiently, entered into a management

agreement with a private entity.  In denying the exemption, the Appraiser reasoned that the agreement was a lease and that the property was no longer being "used exclusively by [the City]."

The parties' exemption dispute ended up in the circuit court, which granted final summary judgment in favor of the City, concluding that the agreement was a management agreement (not a lease) and that the property remained owned and used exclusively by the City.  The First District Court of Appeal reversed and remanded for a final judgment to instead be entered in favor of the Appraiser.  *Brown v. City of Gulf Breeze*, 336 So. 3d 1226, 1232 (Fla. 1st DCA 2022).  Relying on the agreement's compensation structure, under which the management company was compensated not by a fixed fee but based on a formula tied to the difference between revenue and expenses, the First District effectively treated the agreement like a lease but without determining it to be one.  The First District then certified a question of great public importance.  We have jurisdiction.  *See* art. V, § 3(b)(4), Fla. Const.

We conclude that the First District's reliance on the agreement's compensation structure—rather than on the City's

control of the property and its concomitant exclusive use—departed from the focus of the constitutional text of article VII, section 3(a). Under the agreement, the City retained and exercised extensive control over the property. The property thus continued to be "used exclusively by" the City for purposes of article VII, section 3(a). Because the management agreement did not defeat the City's tax exemption, we quash the First District's decision. We also rephrase the certified question to better track the facts of this case and our line of analysis.

## I.

The City purchased the Tiger Point Golf and Country Club in 2012 and began operating it as a public golf course. The City's primary purpose for purchasing the golf course property, which is located immediately next to the City's wastewater treatment facility, was to dispose of effluent water (lightly treated sewage water). Operating a public golf course was a secondary purpose.

In any event, between 2012 and 2015, the City lost money while operating the golf course with its own staff using taxpayer funds. In an effort to stem the loss of taxpayer dollars, the City entered into a contractual agreement in September 2015 with IGC-

- 3 -

Tiger Point Golf Club, LLC ("IGC"), a for-profit golf course management company, to manage and operate the golf course and appurtenant facilities (e.g., restaurant). The agreement set forth various duties to be performed by IGC as well as liabilities to be assumed by IGC. *See generally City of Gulf Breeze*, 336 So. 3d at 1227-28. But under the agreement, the City retained ownership and control of the property. Indeed, among other things, the agreement expressly disavowed being a lease or granting any tenancy or proprietary interest in the golf course and its appurtenant facilities.

The agreement's lease disavowal is consistent with numerous other provisions in the agreement. For example, not only did the City retain the "absolute and unfettered right" to continue to use the property for the disposal of treated effluent, but the agreement provides that the City "shall at all times have access to the [golf course property] for any purpose," and that "nothing in this Agreement shall be deemed to limit the City's right to do anything regarding the [golf course] which the City would otherwise be entitled to do."

The City also retained extensive control of IGC operations, including through direct oversight by the City's Director of Parks and Recreation, who testified that his post-contract role became that of a "contract manager" who met with IGC weekly. Under the agreement, IGC was required to manage the property "as an 18-hole championship golf course" and "in a first-class manner." "No other uses" of the property were "allowed" under the agreement. Among other things, IGC was required to keep the golf course open to the public every day (with certain exceptions), operate the golf course in accordance with terms and conditions of an operating budget agreed to by the City and under rules and regulations established by the City, and comply with public records laws. IGC was also prohibited from doing certain things, including subcontracting any of its duties.

Under the monetary terms of the agreement, as noted above, IGC was compensated based on a formula tied to the difference between revenue and expenses. Ultimately, IGC bore the risk of financial loss and was entitled to retain the Profits—as defined— generated from the golf course and related facilities after paying the

City an Annual Fee—a defined term determined by a formula but that amounted to no less than $100,000 per annum.[1]

## II.

Because the City owned and operated the golf course (through its own employees) between 2012 and 2015, the Appraiser deemed the property exempt from ad valorem taxation for those tax years. In other words, the Appraiser considered the property to be "used exclusively by [the City] for municipal or public purposes." Art. VII, § 3(a), Fla. Const. But the Appraiser denied the City's 2016 application for exemption after determining that the City's agreement with IGC was a "lease" of the property to a private entity. The Appraiser offered no other basis for the exemption denial.

The City contested the 2016 exemption denial by petitioning the Value Adjustment Board (VAB). After an evidentiary hearing, the VAB reversed the exemption denial, finding in part that the City's agreement with IGC was a management contract, not a lease.

---

1. The agreement also granted IGC the right of first refusal to purchase the golf course and its appurtenant facilities, an option that IGC apparently exercised in 2021.

The Appraiser then sought review of the VAB's decision by bringing an action in the circuit court.

Meanwhile, the Appraiser also denied the City's 2017 application for exemption, this time offering multiple bases for the denial. Of relevance, the Appraiser concluded that the agreement with IGC was substantively a lease and—citing this Court's decision in *Sebring Airport Authority v. McIntyre*, 642 So. 2d 1072 (Fla. 1994)—that the property was now being "used" by IGC for a "governmental-proprietary function" rather than for a "governmental-governmental function."

The City similarly contested the 2017 exemption denial, this time in the circuit court. The case was then consolidated with the case involving the 2016 exemption determination.

In the consolidated cases, the circuit court granted final summary judgment in favor of the City. The court agreed with the VAB that the agreement with IGC was a management agreement and not a lease. The court reached that conclusion after examining the entire agreement and concluding that the City retained extensive control over the property, including "the City dictat[ing] how the golf course and related facilities must be operated." That

- 7 -

control, reasoned the court, "establishe[d] that the management company was not granted exclusion possession of the property and the City retained dominion and control of its use." Because the "lease" issue was the Appraiser's "only reason" for denying the 2016 exemption, the circuit court reasoned that its finding that the agreement was *not* a lease ultimately decided the 2016 exemption issue in the City's favor.

Given the circuit court's findings regarding the lease issue, the court unsurprisingly rejected the Appraiser's additional determination for the 2017 tax year that the property was no longer "used exclusively" by the City. Among other things, the court reasoned that the City's "delegation of day-to-day management functions to [IGC] does not mean the City has ceased to 'use' or 'operate' the facilities for purposes of its ad valorem exemption."

The circuit court thus rejected the Appraiser's reliance on *Sebring Airport Authority*, in which this Court upheld the denial of an ad valorem exemption where governmental property was leased to a for-profit corporation to promote and operate an automobile race on that property—an automobile race that the governmental entity had promoted and operated prior to entering the lease. *See*

- 8 -

642 So. 2d at 1072-73.  Distinguishing *Sebring Airport Authority*, the circuit court reiterated that "this case does not involve a nongovernmental lessee (or a lease of any sort)."

Unsatisfied with the conclusions of the circuit court, the Appraiser appealed to the First District.

## III.

On appeal, the Appraiser advanced two arguments, namely that the City's agreement with IGC "substantively constitutes a lease" and that the golf course was no longer being "used exclusively by" the City as contemplated by article VII, section 3(a). Indeed, the Appraiser made clear that the second argument did not turn on the "municipal or public purposes" requirement of article VII, section 3(a), but rather on—in the Appraiser's words—"a different portion of the same constitutional provision," namely the "used exclusively by it" requirement.  The Appraiser framed the issue as one involving "the taxable status of *municipally-owned but privately-used property*."  (Emphasis added.)

The City countered that the agreement was, again, simply a management contract that did not violate the "used exclusively by" requirement.  Not surprisingly, the City pointed to the trial court's

findings and conclusions regarding the City's retained control and its " 'exclusive possession' and 'dominion' over the property."

Presented with those arguments, the First District reversed and remanded for final judgment to be entered in the Appraiser's favor. *City of Gulf Breeze*, 336 So. 3d at 1232. In reaching its decision, the First District took a somewhat novel approach. As an initial matter, the First District determined that it "need not decide" whether the agreement "was, in substance, a lease." *Id.* at 1230. The First District did so even though the "lease" issue was the Appraiser's sole basis for denying the 2016 exemption. Moreover, the First District repeatedly couched its decision in terms of the "municipal or public purposes" requirement in article VII, section 3(a). *See, e.g., id.* ("[W]e hold that the property was not used exclusively for a municipal or public purpose . . . ."). The First District did so even though—as noted above—the Appraiser's argument turned on the constitutional provision's "used exclusively by" requirement.

Some portions of the First District's opinion suggest that the "used exclusively by" requirement may have undergirded the First District's analysis. *See, e.g., id.* ("Florida courts are hesitant to

allow municipal-owned property to gain tax-exempt status when a private actor operates the property and retains the profits *from its use of the property*." (emphasis added)); *id.* at 1231 (noting that IGC was paying the City "what amounted to, an annual user-fee," and referencing IGC's "use of the golf course and related facilities").

But one thing that *is* clear from the First District's opinion is that its focal point was the agreement's compensation structure. *See, e.g., id.* at 1230 ("[IGC] is entitled to the profits generated by its operation of the property. And, importantly here, [IGC] bore the risk of any financial losses . . . ."). That compensation structure led the First District to ultimately conclude that "the City did more than enter a contract for [IGC] to manage the golf course and related facilities. The City converted the property to a *private* commercial enterprise." *Id.* at 1231.

Judge Makar dissented. *Id.* at 1232-37 (Makar, J., dissenting). He opined that the agreement was "a straightforward and prototypical management agreement." *Id.* at 1234. Indeed, he repeatedly noted the significance of the City's retention of "title, use, and control." *Id.*; *see also, e.g., id.* at 1233 ("[T]he City retained ultimate control of its real property as well as the golf course

- 11 -

operations themselves."). And he noted the absence of any "precedent" to support invalidating the ad valorem exemption based on "a plenary management agreement." *Id.* at 1234.

Judge Makar also rejected the notion that IGC's potential to "profit" (i.e., "to make money") was "[]material" to the analysis. *Id.* He explained "that the caselaw raises a red flag" "only when a *lease* of municipal property is entered with a private, for-profit entity." *Id.* at 1234-35 (citing cases). And he again noted the importance of the linkage between "control" and "use." *Id.* at 1235 ("Profiting from the control, possession, and use of leased city property is quite different from making money, even profits, from the management of a city-owned and controlled recreational amenity.").

In the end, on the City's motion for rehearing en banc and certification, the entire First District panel agreed to certify the following question to be of great public importance:

> IS A CITY'S PUBLIC GOLF COURSE STILL BEING "USED
> EXCLUSIVELY BY IT FOR MUNICIPAL OR PUBLIC
> PURPOSES," SO THAT IT REMAINS TAX EXEMPT
> UNDER ARTICLE VII, SECTION 3 OF THE FLORIDA
> CONSTITUTION, IF THE CITY TURNS THE COURSE AND
> ITS APPURTENANT FACILITIES OVER TO A PRIVATE
> BUSINESS TO OPERATE AND MANAGE FOR THE
> BUSINESS'S OWN PROFIT OR LOSS, IN RETURN FOR

AN ANNUAL FEE THAT THE BUSINESS PAYS TO THE CITY FOR THE PRIVILEGE?

*City of Gulf Breeze*, 336 So. 3d at 1237.

**IV.**

The certified question of great public importance presents a question of law that requires us to interpret a constitutional provision. Our review is de novo. *See City of Tallahassee v. Fla. Police Benevolent Ass'n, Inc.*, 375 So. 3d 178, 183 (Fla. 2023) ("Interpreting the Florida Constitution is a matter of law that we undertake de novo.").

As we said at the outset of this opinion, article VII, section 3(a) provides in relevant part: "All property owned by a municipality and used exclusively by it for municipal or public purposes shall be exempt from taxation." On the facts presented by this case, the result hinges on the meaning of the limitation of the article VII, section 3(a) exemption to municipally owned property that is "used exclusively by [the municipality]."

We conclude that—as recognized by the circuit court and by Judge Makar—the dispositive circumstance here is that the City ultimately retained control of its property and IGC's operations

- 13 -

through the terms of the management agreement as well as through direct oversight by the City's Director of Parks and Recreation. That control is exhaustively detailed in the agreement. The significance of the control exercised by the City flows from a proper understanding of the text of the constitutional provision establishing the conditions for the exemption of municipal property from taxation.

As they did below, the arguments of the parties here come down to a dispute over whether the management agreement is simply a means—as the City contends—to facilitate the City's use of the property or a means—as the Appraiser argues—of allowing IGC to use the property for itself in derogation of the City's exclusive use.

Although the City repeatedly cites our decision in *Treasure Coast Marina, LC v. City of Fort Pierce*, 219 So. 3d 793 (Fla. 2017), we do not attempt to fashion and apply an analytical framework from that decision, which deals with a different question than the question presented by this case. Here, we must decide the issue of exclusive use. But in *Treasure Coast*, the Court pointed out that "the 'exclusive use' requirement of the constitutional exemption"

- 14 -

was "not at issue." *Id.* at 803 n.16. The *Treasure Coast* Court's comments suggest that the exclusive use issue was not relevant because the property that was the subject of the dispute—a municipally owned and operated marina—was not property "leased to private operators." *Id.* at 803. The dispositive issue there was whether the operation of the marina was "for municipal or public purposes." *See id.* at 794.[2]

Nor do we fashion an analytical framework from our decision in *Florida Department of Revenue v. City of Gainesville*, 918 So. 2d 250 (Fla. 2005), a case that the Appraiser repeatedly cites but which—again—deals with the issue of "municipal or public purposes." *Id.* at 256. There, the property in question was

_____

2. The City also repeatedly cites the First District's decision in *Zingale v. Crossings at Fleming Island Community Development District*, 960 So. 2d 20 (Fla. 1st DCA 2007), which this Court quashed on an unrelated issue in *Crossings at Fleming Island Community Development District v. Echeverri*, 991 So. 2d 793 (Fla. 2008), but otherwise later cited with approval in *Treasure Coast*, 219 So. 3d at 798 n.4. The City does so because *Zingale* in relevant part affirmed the trial court's ruling that a municipally owned golf course operated by a management company was exempt from property taxes. But the relevant issue in *Zingale* was whether the property was "used for a proper municipal purpose," not whether it was used exclusively by the municipality. 960 So. 2d at 26. We decline to conflate the issues.

- 15 -

"municipally owned and operated telecommunications facilities," and the *City of Gainesville* Court made clear that the dispositive issue "hinge[d] on whether providing two-way telecommunications services to the public always serves 'municipal or public purposes' as contemplated in article VII, section 3(a)." *Id.*

Here, the Appraiser concedes that the operation of the golf course by the City would be for a valid municipal purpose but asserts that the provisions of the management agreement related to the compensation of IGC require the conclusion that the property is not used exclusively by the City. In support of this conclusion, the Appraiser relies on the body of law in which we have held that municipally owned property that is leased will not be exempt from taxation, except when the property is used for "the administration of some phase of government," which we have categorized as a "governmental-governmental" use. *See, e.g., Sebring Airport Auth.*, 642 So. 2d at 1074 & n.1.

A fundamental teaching of these cases is that municipal property that is leased for "governmental-proprietary" uses will be denied the exemption even though the exemption would be available for the property if it had been put to the same use by the

municipality itself without a lease.  As the Appraiser admits, the cases on which he relies all deal with circumstances in which municipal property was leased for "governmental-proprietary" uses.

The discussion in those cases of profit making—which is a major focus of the Appraiser's argument—relates exclusively to profit making by leaseholders.  The Appraiser thus recognizes that "all of these cases have involved use of governmentally-owned property by a for-profit company pursuant to a lease."  And we have previously recognized that what we have said about "private leaseholds of municipal property" and "private interests in municipally owned property was never intended to apply to property both owned and used exclusively by a municipality for municipal or public purposes."  *City of Gainesville*, 918 So. 2d at 260-61.

The Appraiser seeks to bring the present controversy within the ambit of the case law denying the exemption by presenting a conclusory argument that the management agreement "substantively constitutes a lease."  But the Appraiser does not address how the extensive control retained by the City under the management agreement would be consistent with the conclusion that the management agreement is "substantively" a lease—i.e.,

- 17 -

that the management agreement substantively "convey[ed]" to IGC the City's "right to use and occupy the property." *See Lease, Black's Law Dictionary* 1066 (11th ed. 2019). The structure of the compensation provided to IGC does not supply a basis in itself for treating the management agreement like a lease. The City's control and exclusive use are not negated by the compensation structure under the management agreement. And the First District's reliance on that compensation structure as the ground for denial of the exemption—effectively treating the agreement like a lease without determining it to be one—departs from the focus of the constitutional text.

Generally, a leaseholder exercises extensive control over the leasehold property. The use of a leasehold may be subject to various restrictions imposed by the owner, but plenary control by the owner of the use of the leased property is ordinarily inconsistent with the granting of a leasehold. When a property owner leases property to another, that property is typically under the control of the leaseholder. It then is no longer available for the use of the owner but has been committed to the use of the leaseholder. There is an undeniable linkage between control and use.

Accordingly, absent municipal control of property, there can be no exclusive municipal use. Conversely, the exclusive use of property by a municipality necessarily follows from the legal right of the municipality to control the property coupled with the exercise of that right. When such municipal control is possessed and exercised, access to the property by others and any use incident to that access is subject to the control of the municipality and therefore will be subject to and will subserve the municipality's exclusive use.

The extensive control typically exercised by a leaseholder over a leasehold of municipally owned property thus is inconsistent with the exclusive use of the property by the municipality. That point is the implicit foundation for our case law holding that leases of municipal property for governmental-proprietary uses disqualify the property from exemption. We have said that the current version of the constitutional provision granting the exemption—with its requirement of exclusive use by the municipality—was adopted to overturn our prior approval of exempt status for municipal property that was leased for such governmental-proprietary uses. *See City of Gainesville,* 918 So. 2d at 260 (recognizing that the "owned and

used exclusively by" requirement in article VII, section 3(a) "was seen as a response to the 1965 decision in *Daytona Beach Racing & Recreational Facilities District v. Paul*, 179 So. 2d 349, 353 (Fla. 1965)"); *Volusia Cnty. v. Daytona Beach Racing & Recreational Facilities Dist.*, 341 So. 2d 498, 501 (Fla. 1976) (same). The distinct category of municipally owned property leased for governmental-governmental uses—a category that it appears has never been applied in a decided case—receives different treatment apparently because the exercise of governmental powers involved in such uses assumes the necessity of municipal control and the exclusive use that would flow from such control.

In resolving the controversy presented by this case, the relevant constitutional test is exclusive municipal use. And the hallmark of such municipal use is municipal control. Neither the involvement of a management company to facilitate the City's efficient operation of the property for its own purposes and use nor the means chosen to compensate that management company are in anyway in derogation of the City's control of the property and its concomitant exclusive use.

Based on this line of analysis, we rephrase the certified question as follows:

Is a municipally owned golf course property over which the municipality exercises extensive control disqualified from exemption under article VII, section 3(a) because a management company used by the municipality in the operation of the property is compensated not by a fixed fee but based on a formula tied to the difference between revenue and expenses?

We answer this question in the negative.

## V.

The City-owned golf course property continued to be "used exclusively by" the City—for purposes of article VII, section 3(a) of the Florida Constitution and its ad valorem tax exemption for certain municipally owned property—after the City entered into a management agreement under which the City retained and exercised extensive control over the golf course property and the management company's operation of the property. The agreement and its formula-based compensation structure thus did not defeat the City's ad valorem exemption. Having answered the rephrased certified question, we quash the decision of the First District.

It is so ordered.

- 21 -

MUÑIZ, C.J., and CANADY, LABARGA, COURIEL, GROSSHANS, and FRANCIS, JJ., concur.
SASSO, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal
    Direct Conflict of Decisions/Statutory Validity

        First District - Case No. 1D19-4245

        (Santa Rosa County)

Edward P. Fleming and Matthew A. Bush of McDonald Fleming, LLP, Pensacola, Florida,

        for Petitioner City of Gulf Breeze

Loren E. Levy of The Levy Law Firm, Tallahassee, Florida,

        for Respondent Gregory S. Brown, Santa Rosa County
        Property Appraiser

Rebecca A. O'Hara and Kraig A. Conn of Florida League of Cities, Inc., Tallahassee, Florida,

        for Amicus Curiae Florida League of Cities, Inc.